CASTEEL v. STATE.

Opinion delivered December 3, 1904.

1. HOMICIDE—EVIDENCE—RES GESTAE. — In a prosecution for murder, where the defense was that the killing was accidental, testimony that defendant, some months before the killing, had remarked to another

that he had a cousin who had killed two or three men, and that he wanted to make a similar reputation, is not part of the *res gestae,* and is inadmissible. (Page 158.)

2. SAME—HEARSAY EVIDENCE—Where the defense in a murder case was based on the theory that the deceased and defendant were friends, and that the killing was accidental, testimony of a witness that some months prior to the killing deceased told her that defendant did not like him, and had imposed upon him, was hearsay. (Page 158.)

3. SAME—INSTRUCTION—Where there was evidence in a murder case that the killing was accidental, it was error to refuse to instruct that if the killing was accidental, the jury "should find the defendant not guilty, unless they further find from the evidence that such accident was the result of negligence." (Page 158.)

Appeal from St. Francis Circuit Court.

HANCE N. HUTTON, Judge.

Reversed.

STATEMENT BY THE COURT.

At the March term, 1904, of the circuit court of St. Francis County the grand jury returned against appellant an indictment for murder in the first degree, charging that he, on the 25th of December, 1903, in St. Francis County, Arkansas, did unlawfully, feloniously, willfully, deliberately, premeditatedly, and with malice aforethought, wound, kill and murder Hall Sanders, by shooting him with a pistol, against the peace and dignity of the State of Arkansas.

At the same term, after arraignment and plea of not guilty, appellant was tried before a jury, convicted of murder in the second degree, and his punishment assessed at eighteen years in the penitentiary.

There were several eye witnesses to the killing. Paul Pope testified on behalf of the State as follows: "About 7:30 o'clock P. M. on last Christmas night, James Alley, Hall Sanders, Guy Eldridge and I, while standing in front of Sanders' drug store, concluded to get some fireworks and have some sport. When we had gotten them, and were going down the street, we met defendant, and some one of our crowd asked him how far we would have to go before we could shoot the fireworks. He said,

'Across the next street.' We went on, and when we had got to about Batlin's residence, we lit off one or two Roman candles, and were crossing at the next crossing, when some one ran up behind me, and grabbed a Roman candle out of my hand. I looked around, and saw the defendant, and asked him what he meant. He said, 'You see what I mean.' Then I turned to Mr. Rainbolt, asked him what I had done, and told him that if I had violated any ordinance, I wanted to pay for it; but I didn't think I had. I then turned to defendant, and in a joking way said, 'Gordon, you pay me for the Roman candle you broke.' He said he would, ran his hand in his pocket, took out fifty cents, and, when I told him that I was joking, he insisted on paying for it, and I took the pay. A question then came up about what authority he had for doing as he was doing. I believe Mr. Rainbolt said that he was no deputy marshal. He then said he was working under McKnight. Then there was a dispute about how far he told us to go before we could shoot. Guy Eldridge said to him, 'You told us we could shoot after we crossed this street up here.' Defendant said, 'What have you got to do with it?' The deceased then said, 'You told us we could shoot across this street up here.' Then defendant called him a liar, whereupon deceased pulled off his overcoat and said, 'That's enough of that, now,' and walked over to him, being about four or five steps from him at the time. Deceased got his overcoat off before he got to him, walked up to him, and laid his hand on his left shoulder. Defendant stepped back and at that instant the gun fired, and deceased fell. I think deceased had some fireworks in his hands when he started toward defendant, but he threw them down. He dropped his overcoat on the ground. I guess they were about six feet apart when the pistol fired. I did not see the pistol until after the shooting, when Rainbolt took it from defendant. Rainbolt said to defendant, 'What on earth have you done?' and defendant said, 'I didn't do it; I didn't do it.' I then stooped down to take hold of deceased, but some one said to go and get a doctor, and I went. When deceased started toward defendant, he had one of those torpedo sticks in his hand, and probably some other fireworks. I don't think deceased was mad. When he got up to defendant, and laid his hand on his shoulder, defendant stepped back."

The testimony of all the witnesses to the killing shows substantially the same state of facts. Several of the witnesses say that, after defendant told deceased that he was a liar, deceased approached defendant laughing; that when deceased walked toward defendant, and put his arm on him, deceased was laughing. Deceased was unarmed.

Appellant detailed the circumstances of the killing as follows: "About 7:30 o'clock P. M. on the night of the 25th of December last, when I was standing on the sidewalk between Folbre's and Nelson's, some boys came by and asked me where the limit was beyond which they might shoot some fireworks. I did not notice them particularly, and did not recognize them. I thought they were from Marianna, and told them where the limit was. They passed on, and after a few minutes the marshal, Mr. Rainbolt, came along, and I told him some boys from Marianna had gone up the street to shoot some fireworks, as I heard he was looking for them. He asked me to go with him, and I went. We had started to the depot, and had gone a short distance when I said, 'There are those boys now.' Rainbolt said, 'Let's go down there.' When we got there, we found they were boys of our own town, and Mr. Rainbolt cautioned them about shooting toward houses, and told them not to shoot low. I took a Roman candle from Paul Pope, which I thought he had already shot. In taking it I broke it. I was only playing with him. He said to me, 'You must pay me for that.' I said, 'All right,' and paid him. The boys commenced talking to Mr. Rainbolt. One of them told him I said they could shoot up across Jackson street. I told them I did not. Guy Eldridge said, 'Yes, you did,' and I said, 'What have you got to do with it?' Then deceased called me some name which I do not remember, and said, 'Yes, you did; you know you did.' I remarked, 'You are a liar,' as I had done many times before. I paid no further attention to deceased; thought nothing further about it. We were all standing scattered around there, Mr. Rainbolt just in front of me, with his back to me; Guy Eldridge beyond him and facing him; northeast of me, and about six or eight feet from me, James Alley. I don't remember the position of Paul Pope and deceased. At this juncture it occurred to me that I would shoot a pistol to see if Rainbolt would jump. So I drew mine, and turned to shoot in the opposite direction from the crowd, and down at the

ground. When I fired it, I did not see any one near me; but after I fired deceased fell, and said he was shot. I had started to put up my pistol when Rainbolt took it from me, and said, 'Gordon, you have shot that boy.' I replied that I had not. Rainbolt said, 'Yes, you have,' and I replied, 'If I have, it was an accident,' as it was; for I had no thought or intention of shooting anybody. I was only thinking of shooting a Christmas gun, and having a laugh on Rainbolt if he jumped. There never was any ill feeling or anger between deceased and me; we have always been friends. I had no thought or purpose of shooting him, and for an instant could not realize that I had done so. I helped carry him into Mr. Gatling's house, and told him how sorry I was, and that I would pay all of his expenses occasioned by it. When I shot, I pointed the muzzle of the pistol downward, so as to shoot into the ground. Deceased must have been standing near me, but I did not see him. He could not have been close enough to me to put his hand on me. It was no uncommon thing for him and me, when joshing each other, to pass the lie. At this neither of us ever took any offense. This was also common among the other boys of the town when joking in a friendly way. I never had an unkind feeling or thought toward deceased. I never regretted anything more than this, for then I had, as I always had, the kindest feeling for deceased."

There was other evidence on behalf of appellant to the effect that defendant and deceased had always been on friendly terms, and that their friendly relations continued up to the time of the killing. On cross-examination, appellant was asked this question: "Did you in March, 1903, in Nelson's saloon, have a conversation with Riley Hunt, and state to him that you had an uncle or cousin at Haynes, in Lee County, who had killed two or three men, and that you wanted to, or were going to, make a reputation like him?" Appellant objected to this question, and, on his objection being overruled, excepted. He then answered: "Had no such conversation, and made no such statement." He was further asked: "Did you not, a month or two, or a short time before the death of Sanders, state to Riley Hunt, in Nelson's saloon, that you wanted to make a reputation like your uncle's or cousin's, who lived at Haynes, who had killed two or three men," Appellant objected to this question, and, on his

objection being overruled, excepted. He then answered: "I had no such conversation, and made no such statement."

The State, in rebuttal, introduced Riley Hunt, who testified: "Some time in March, 1903, the defendant, in the course of a conversation with me, in Nelson's saloon, said that he wanted to make a reputation like that of his cousin, Will Curtis, who lived at Haynes, and had killed two or three men." Appellant objected to this evidence as incompetent and irrelevant, moved to exclude, and, on being overruled, excepted.

When this witness, Hunt, was introduced, appellant objected to his testifying, on the ground that he had, in violation of the rule under which witnesses were placed, remained in the court room, unknown to him, and heard questions propounded to him as to what he told witness Hunt, and, on his objection being overruled, excepted.

Mrs. T. V. Prude was here introduced, and, over the objection of appellant on the ground that she had, in violation of the rule, remained in court and heard other witnesses testify, was permitted to testify as follows: "I knew deceased well; he was a frequent visitor at my house. Q. Did you know the relations that existed between him and the defendant? A. I did. Frequently when he was at my house, he talked with me confidentially, and told me that defendant did not like him, and had imposed on him. He also said that when defendant did it again, he was going to thrash him; they were not friendly." Here appellant objected to this testimony as incompetent and irrelevant, moved to exclude it, and, on being overruled, excepted. "Q. Do you know of your own knowledge whether they were friendly or unfriendly? A. I only know what deceased told me about it, which was some time in the summer."

The court instructed the jury as to what constituted murder in the first degree, and the punishment therefor; as to what constituted murder in the second degree, and the punishment therefor; as to what constituted manslaughter, and the punishment therefor; and read to them section 1657 of Sandels & Hill's Digest, which is as follows: "If the killing be in the commission of an unlawful act, without malice, and without the means calculated to produce death, or in the prosecution of a lawful act done without due caution and circumspection, it shall be manslaughter."

Appellant then asked the court to instruct the jury "that if they found from the evidence that the killing of the deceased was accidental and unintentional, they should find the defendant not guilty, unless they further find from the evidence that such accident was the result of negligence," and on the court's refusal to do so excepted.

*R. J. Williams,* for appellant.

*George W. Murphy,* for appellee.

WOOD, J., (after stating the facts.) The testimony of Riley Hunt was wholly irrelevant. It was too remote in point of time and place to become a part of the *res gestae.* It was exceedingly prejudicial to appellant, and the court erred in admitting it.

The testimony of Mrs. Prude was hearsay, and was prejudicial to appellant, inasmuch as it tended to show that deceased and appellant were not on friendly terms, thus contradicting the theory of the defense put forth by appellant that he and deceased were good friends at the time of the shooting, and that the killing was unintentional and accidental. It was error to admit it.

The testimony of appellant himself was enough to entitle him to the instruction asked for. Appellant was entitled to have an instruction covering every material point in the case developed by the proof. His own testimony, the weight of which was for the jury, certainly presented the question of an accidental shooting.

For the errors named the judgment is reversed, and the cause is remanded for new trial.