## BENNETT *v.* STATE.

### Opinion delivered May 9, 1910.

1. HOMICIDE—HARMLESS ERROR.—One convicted of manslaughter cannot complain because the jury convicted him of a lower degree of homicide than that of which the evidence showed him to be guilty, if guilty at all. (Page 104.)

2. EVIDENCE—COMPETENCY.—In a prosecution of defendant for having killed a negro man, it was not error to permit a witness for the State to testify that, taking all of the circumstances, the deceased negro was afraid of defendant; it not appearing that the statement was based upon any statement of the deceased made in defendant's absence. (Page 104.)

3. SAME—CIRCUMSTANCE CONNECTED WITH KILLING.—It was not error, in a, murder case, to permit a witness to testify that he found the deceased's hat on the day after the killing in the corner of defendant's room covered up with beer bottles. (Page 105.)

4. HOMICIDE—WHEN INSTRUCTION HARMLESS.—Error in giving instructions as to involuntary manslaughter in a prosecution for murder was not prejudicial where the jury found defendant guilty of voluntary manslaughter. (Page 106.)

5. SAME—INSTRUCTIONS.—One indicted for murder and convicted of voluntary manslaughter cannot complain of instructions that allowed the jury to find him guilty of a lower degree of homicide than he was guilty of under the evidence, if guilty at all. (Page 106.)

6. INSTRUCTIONS—REASONABLE DOUBT.—It is error to charge that a reasonable doubt is one "for which a good and valid reason should be given." (Page 107.)

7. SAME—NECESSITY OF REASONABLE DOUBT.—The objection to an instruction on the subject of reasonable doubt that it must be one "for which a good and valid reason should be given" must be raised specifically. (Page 107.)

Appeal from Bradley Circuit Court; *Henry W. Wells,* Judge; affirmed.

#### STATEMENT BY THE COURT.

On or about the 23d day of November, 1908, at the town of Banks, in Bradley County, Arkansas, Ike Bennett killed a

young negro man named Young Hill. Bennett was engaged in the restaurant business. Hill a short time before had been working for Bennett. At the time he was killed, he was working for Doctor Thomas. Late in the afternoon, about dark, Hill was seen with two water buckets in his hand, going towards a well and also towards Bennett's restaurant. When he got close to the restaurant, Bennett called to him and said. come in and get a drink, or to come in and he, Bennett, would give him a drink. One witness said Bennett in a kind of laughing way said: "G— d—, come in and get a drink!" Another witness says he understood Bennett to say: "I feel like killing a damn negro," and the negro replied, "Why, Mr. Bennett!" When Bennett told the negro to come in, the negro replied "he did not care much about a drink, but would go anyhow." When Bennett "talked of killing the negro, he talked loud, like he did not care who heard him." About thirty minutes after Bennett and Hill passed into the house, the shooting took place. Hill was shot with a pistol just above the right eye. The constable was notified that something was wrong in Bennett's restaurant. He summoned a posse, and they guarded the house. At the time the negro was killed two other men besides Bennett were in the restaurant. They were working for Bennett. After Bennett killed the negro, he dragged him behind the counter. His explanation of this was that he had whisky in his house, and that people were coming in and out, and it was necessary to hide the body until he could get the whisky out of the house, and this he endeavored to do.

The two men that were working for Bennett as well as Bennett were arrested. After Bennett and they were arrested, Bennett said: "Turn the other two loose. I killed the negro, and all that I hate is that I hadn't killed the s— of b— two or three weeks earlier." Bennett was drinking. His explanation of the killing was that it was accidental.

Bennett was indicted for murder in the first degree, and was convicted of voluntary manslaughter, and sentenced to three years' imprisonment in the penitentiary. Appellant objected to the following questions and answers of witness Dr. Thomas: "Q. Did Young Hill, at any time just prior to his taking off, have any conversation, in which he was or wasn't present, in which he stated he was going to have to leave Banks on account

of Mr. Bennett? A. Yes, sir. Q. From what you saw, and know, and observed of the negro, was he or was he not afraid of Mr. Bennett? A. I can't answer that question direct and positive. Q. From what you saw, heard and observed, was the negro afraid of Ike Bennett? A. The negro was afraid of him, taking the circumstances connected there. The relation-ship between the deceased and the defendant at the time he worked for Ike Bennett I will answer like this: Ike and the negro were having conversations day after day while the negro was working for me. My wife was tired of it, and so was I, because it was taking up the time of the negro, and he came to him frequently. I was about half mad at him. My patience had got worried on account of the negro's time being lost. I told Young Hill, 'If you want to work for Mr. Bennett go and work for him.' I don't know that the conditions between Young Hill and Ike Bennett were strained."

The appellant also objected to the following questions and answers in the testimony of G. B. Colvin, sheriff, who testified in rebuttal on behalf of the State: "Q. Did you go to the place where this killing occurred? A. It was the following day; I suppose it was the middle of the morning, about 9 or 10 o'clock. Q. Did you see the interior of the house? A. Yes, sir. Q. Did you see any of the clothing or effects of the deceased in that house? A. Yes, sir. Q. What and where? A. I saw the clothing he had on. Q. Aside from that? A. I didn't see anything except his hat. Q. Where was it? A. Right in the corner of the room was a barrel of empty beer bottles. It fell to my lot to take charge of the liquors. In going through there we found the hat covered up in the beer bottles."

During the cross examination of witness E. C. Peak, who was a witness for appellant, the prosecuting attorney held in his hand a paper, and asked the witness questions in a man-ner indicating that the witness at the examining trial had made answers and given testimony contradictory of the testimony he was then giving. The following are illustrations of the manner in which the questions were asked:

"Q. You testified that Ike was pouring out wine before? A. I don't know whether he was or not, or whether he had gone behind the counter yet or not. Q. At the examining trial

you were asked that question, 'Did you go for a hack or buggy or something?' A. Yes, sir. Q. Isn't this your answer: 'Yes, sir; after a short while I took Ike's gun from him and put it away; then I went to Dr. Thomas to get a buggy. I really wanted to get away from there and make myself clear?' A. Yes, sir; I wanted to get the whisky away. Q. Did you answer that at the examining trial? A. Probably I did. Q. You say now that Ike told you to go. You said in the examining trial, 'Really, I don't know whether Ike sent me for the buggy or not; I don't think he had anything to do with that.' That is what you testified in the examining trial; is that true? A. I don't know, sir. Q. Which one of these statements is true; the one then or now?" etc.

The court gave the following among other instructions, over the objection of appellant:

"10. If the killing be in the commission of an unlawful act, without malice and without the means calculated to produce death, or in the prosecution of a lawful act done without due caution and circumspection, it shall be manslaughter.

"11. The killing of a human being without a design to effect death in the heat of passion, but in a cruel and unusual manner, unless it be committed under circumstances that would constitute excusable or justifiable homicide, shall be adjudged manslaughter.

"14. You are instructed that a reasonable doubt is not a mere imaginary or captious doubt, but is one for which a good and valid reason should be given; and if you believe that the State has proved to a moral certainty, by the circumstances, conduct and confessions of defendant, and by his actions and demeanor before and after the commission of the murder, then you will find the defendant guilty."

A motion for new trial assigning as error the various rulings to which objections had been made and exceptions taken was filed and overruled. This appeal has been duly prosecuted.

*Herring & Williams,* for appellant.

Involuntary manslaughter is committed where death results unintentionally. 74 Ark. 268. It is error to charge that a reasonable doubt is such doubt as the jury are able to give a reason for. 133 Ind. 677; 33 N. E. 681. A defect in an

instruction should be reached by a specific objection. 73 Ark. 320.

*Hal L. Norwood,* Attorney General, and *W. H. Rector,* Assistant, for appellee.

The manner and extent of the examination of witnesses is a matter resting in the discretion of the trial court. 63 Ark. 108; 75 Ark. 142; *Id.* 548; 66 Ark. 545. Appellant's objection to instructions should have been more specific. 73 Ark. 320; 65 Ark. 255; 73 Ark. 350; 69 Ark. 558; 75 Ark. 325. The idea of ability to respond if called upon to give a reason for the doubt is not required by the instruction complained of. 64 N. W. 130; 62 Mich. 329; 120 Ala. 303; 97 Ala. 37; 118 Wis. 621; 94 N. W. 375; 102 Wis. 364; 100 N. Y. 503; 67 Fed. 698; 43 La. Ann. 955; 25 Ore. 242; 41 Fla. 547.

WOOD, J., (after stating the facts). 1. We would not have disturbed a verdict, under the evidence, for murder in the first degree. There is evidence tending to show that appellant was guilty of murder in the first degree. There is no evidence tending to prove that appellant was guilty of voluntary manslaughter. His crime was murder in the first degree, if anything. By finding the appellant guilty, the jury accepted the testimony tending to prove guilt, and rejected the testimony of appellant tending to prove his innocence. Since there was testimony tending to show that appellant was guilty of murder in the first degree, he can not complain because the jury, believing him guilty of some offense, found for a lower degree than that of which he was guilty, if guilty at all. Appellant was not prejudiced by the verdict as to the degree of homicide of which the jury found him guilty, since they might have found him guilty under the evidence of the highest crime charged in the indictment.

2. There was nothing in the testimony of Doctor Thomas showing that he reached the conclusion that Young Hill was afraid of appellant from conversations had with Young Hill when appellant was not present. The first interrogatory and the answer thereto indicates that Young Hill in a conversation stated that he was going to leave Banks on account of appellant. But neither the question nor the answer indicated whether or not appellant was present when the conversation was had.

Indeed, the question was so indefinite it was impossible to say
with whom the conversation was had, or who was present tak-
ing part in it. The whole of the testimony of Doctor Thomas
simply tends to prove that he had reached the conclusion that
Young Hill was afraid of appellant. But he nowhere testifies
that this conclusion was reached from any conversations he,
the witness, had with Hill. The witness reached this conclusion,
"taking the circumstances connected there," and he details what
these circumstances were. The case of *Casteel* v. *State,* 73 Ark.
152, upon which appellant relies, is not like the case at bar.
There the witness was allowed to testify that some months
prior to the killing deceased told her that the defendant did not
like him, and had imposed upon him. Such testimony was
bald hearsay. But such is not the character of the testimony
of Dr. Thomas, *supra.*

3. The testimony of the sheriff to the effect that he found
the hat of Young Hill the day after the killing in the corner
of the room covered up in the beer bottles was not prejudicial
to appellant. The sheriff identified the hat as "his" hat, mean-
ing the hat of Young Hill. It was proper testimony to disclose
to the jury the situation of the deceased and his articles of
clothing, and all the circumstances of the place where the killing
occurred. The hat was sufficiently identified as that of Young
Hill by the term "his" which the witness used in designating
it. If appellant disputed that it was the hat of Young Hill
and desired a more specific statement of the reasons why the
witness concluded that it was the hat of Hill, appellant should
have called for such reasons by cross examination on the point,
or by specific objection to the effect that the hat had not been
sufficiently identified, nor appellant's connection with placing
it among the beer bottles sufficiently established. But this was
not done.

4. We find no prejudicial error in the ruling of the court
concerning the cross examination of witness Peak. The appel-
lant did not object to the manner of cross examining this wit-
ness by the prosecuting attorney until the cross examination
had been nearly concluded. He did not then nor thereafter ask
that all the testimony of the witness that had been elicited in
the alleged objectionable manner be excluded. The testimony
that was elicited on cross examination after the objection was

made was not prejudicial to appellant. We have examined the entire testimony of Peak, and there is nothing in his evidence (giving it full credit and conceding that it corroborated the testimony of appellant as to the reason why he temporarily secreted the body of Young Hill) that tends to excuse or justify appellant in the killing of Hill. The witness Peak did not see the killing. He did not know why or how it was done, and the jury under the undisputed evidence could have cóme to no other conclusion than that the attempt to hide the body for a time after the killing was for no other purpose than to give appellant time to remove the liquors he had in his restaurant for illegal sale, before the crowds should gather to investigate the killing. The testimony of appellant and the testimony of Peak show this, and it is not probable that the jury concluded that the hiding of the body of Hill behind the counter, etc., was for any other purpose. There is no evidence anyhere in the record that appellant attempted to deny the killing of Hill. On the contrary, he admitted it from the first. He did not attempt to conceal that fact at any time. We see no error in the ruling of the court in regard to the cross examination of witness Peak.

5. There was no error of which appellant can complain in the giving of instructions 10 and 11 concerning involuntary manslaughter, for the jury did not find appellant guilty of involuntary manslaughter, but of a higher crime. He was not prejudiced, therefore, by the instructions, and the verdict shows that the jury were not influenced by them.

6. The court correctly charged the jury as to voluntary manslaughter. The case of *Tanks* v. *State*, 71 Ark. 459, has no application here. Tanks was convicted of murder in the second degree, when there was no evidence to warrant conviction of any offense above manslaughter. There it could not be said that an erroneous and abstract application of the statute as to manslaughter did not prejudice the minds of the jury and cause them to find the accused guilty of a higher crime than the evidence warranted. As the verdict was for a higher crime and with no evidence to warrant it, and as the instruction was abstract, prejudice in giving it was apparent. But here the verdict was for a lower crime than the evidence warranted, upon any finding of guilt. Appellant, therefore, is not prejudiced,

and can not complain of instructions that allowed the jury to find him guilty of a lower grade of homicide than he was really guilty of under the evidence, if guilty at all. The jury found him guilty, but were more lenient in fixing the degree of the crime and its punishment than the law and the evidence warranted, on a finding of guilt.

7. In instruction number 14, the court told the jury that a reasonable doubt is not a mere imaginary or captious doubt, but is one *"for which a good and valid reason should be given,"* etc. This court, in *Darden* v. *State,* 73 Ark. 315-320, condemned the words "a reasonable doubt is one for which a juror could give a reason if called upon to do so," in an instruction defining reasonable doubt. The words under consideration are similar, and add an improper and erroneous qualification to the definition of reasonable doubt contained in the other language of the instruction.

The Supreme Court of Indiana, in passing on an instruction which told the jury that "a reasonable doubt is such a doubt as the jury are able to give a reason for," said: "A juror may say he does not believe the defendant is guilty of the crime with which he is charged. Another juror answers, if you have 'a reasonable doubt of the defendant's guilt, give a reason for your doubt.' And under the instruction given in this cause the defendant should be found guilty unless every juror is able to give an affirmative reason why he has a reasonable doubt of the defendant's guilt. It puts upon the defendant the burden of furnishing to every juror a reason why he is satisfied of his guilt with the certainty which the law requires before there can be an acquittal. There is no such burden resting on the defendant or a juror in a criminal case."

We approve the above, and all that is said by the Supreme Court of Indiana in *Siberry* v. *State,* 133 Ind. 677, 88, 89, 90, concerning the definition of reasonable doubt as stated *supra.*

But in the Darden case we said: "If this be a defect, which we think it was, it should have been reached by a specific objection. It is one the court would have doubtless readily remedied if its attention had been called to it." So it may be said here. The instruction without these words contained others that have been often approved by this court; and, if appellant had wished the instruction confined to the definition as sanctioned

by the court, he should have made specific request for the elimination of the objectionable words.

Affirm.