State v. Kidd, 24 N. M. 572.

[No. 1886.   Aug. 24, 1917.]
[On Rehearing, Sept. 12, 1917.]
## STATE v. KIDD.

### SYLLABUS BY THE COURT.

1.  Appellant was convicted of voluntary manslaughter. According to his own testimony and that of others, he was assaulted with a deadly weapon, a pistol, and threatened with immediate death.   There was evidence tending to show previous illicit relations between appellant and the wife of deceased.   Under such circumstances it was not error to submit to the jury the issue as to the guilt of the defendant of voluntary manslaughter, and the proof was sufficient to support such a verdict.   All that is required to reduce a homicide from murder to voluntary manslaughter is such heat of passion arising from such adequate provocation at the time as to excite in the mind such emotions as anger, rage, sudden resentment, or terror as may be sufficient to obscure the reason of an ordinary man, so as to prevent deliberation and premeditation and to exclude malice, and to render the slayer, acting as an ordinary man, incapable of cool reflection.

P. 577

2.  The error in admitting a photograph in evidence which has not been accounted for is waived by a subsequent admission by the party concerned of its genuineness.        P. 580

3.  Appellant was charged by the mother of the deceased with illicit relations with the wife of the deceased, and he failed to deny the same.   The evidence was correctly received by the court as an admission by silence.   In overruling an objection to the evidence, the court stated that he admitted it on the theory of an admission by silence, and that he regarded the silence of appellant as of great importance.   While exception to the remarks was taken, no motion to withdraw the remarks from the jury was made.   It is *held*, for that reason, that no available error intervened.        P. 582

4.  Where counsel object to a question calculated to qualify a witness to speak to a certain point, and have opportunity given them by the court to disqualify the witness, but failed to do so, they cannot complain of his testimony.

P. 582

State v. Kidd, 24 N. M. 572.

5. A witness was allowed to testify that one of the defendants was a go-between between appellant and the wife of the deceased. In so testifying the witness was detailing the reasons she had for ordering the man away from her hotel, and gave all of the facts upon which she based her inference that he was a go-between. It is *held* that the admission of this evidence was harmless error under the circumstances.

P. 583

6. A witness testified for appellant that he was in the hotel in front of which the homicide occurred; that he heard a shot, and then went to the door and saw the deceased in the act of picking up a six-shooter from the ground, and the appellant in the act of drawing his pistol from his pocket. He was asked on cross-examination whether, shortly after the killing, the mother of the deceased did not, in the presence of his mother and a Mrs. Farmer, upbraid him for not going to the assistance of her son and saving him from death, and whether Mrs. Farmer did not then say that the mother of the deceased must not blame the witness for the reason that the witness' mother was holding him, and that he could not go out under the circumstances. The mother of the deceased was put on in rebuttal and testified to such conversation. It is *held* that the testimony was admissible on the theory that the circumstances placed before the witness were such as to call for a denial if the statements were untrue, and reflected upon the truth of the testimony of the witness at the trial.

P. 584

7. A witness was asked whether he, on a certain occasion, made a certain admission concerning his knowledge of the homicide. He was then asked if he made the same admission to another person, and then asked whether he made the same admission to two other persons. *Held*, that the occasion of the admission was sufficiently identified for the purpose of the impeachment.

P. 585

8. Where the context of a question shows that the time referred to must have been just after the homicide, instead of just before, as it appears in the transcript, complaint of the incompetency of the evidence will not be heard on that ground.

P. 586

9. The court erroneously rejected testimony as to the animosity of two witnesses against appellant on the ground that

they had not been interrogated on the subject when on the stand. It appears, however, that two other witnesses had testified, without objection or contradiction, to the facts upon which the animosity was predicated. It is *held*, under the circumstances, the facts being undisputed, and the evidence being merely cumulative, that the error was immaterial.

P. 586

10. Two cartridges, suitable for use in the gun of the deceased, and unsuitable for use in the gun of appellant, were found in front of the hotel where the homicide occurred, two days after the homicide, and were offered by appellant. The circumstances were such that the deceased had no opportunity to unload his 45 Colt's six-shooter during the controversy, and no proof was offered that he did in fact afterwards unload the gun. It is *held* that the court properly excluded the cartridges for want of relevancy.                    P. 587

11. A witness testified to a dying declaration by deceased when he was conscious and knew of his imminent and impending death, according to the witness. Counsel, for exclusion of the declaration, relied upon the testimony of physicians to the effect that the deceased was in a semi-comatose state both before and after an operation for the wounds upon him, but did not seek, by cross-examination, to disqualify the declaration. Under such circumstances the declaration was properly admitted.                    P. 589

12. A witness testified as to statements made by a codefendant as to the circumstances of the killing. No application was made to have the evidence limited to the codefendant, and the evidence at the time it was admitted was competent against the co-defendant. Under such circumstances, no complaint can be made here by appellant.       P. 590

13. Counsel must object to questions calling for objectionable testimony, and a subsequent motion to strike the same may be properly refused.                    P. 590

14. Where counsel, although given opportunity by the court, failed to cross-examine a witness sufficiently to destroy the foundation for secondary evidence of the contents of a letter, they cannot be heard to complain of the admission of such secondary evidence.                    P. 591

State v. Kidd, 24 N. M. 572.

### On Rehearing.

15. Where defendant's witness testified that he saw deceased picking up a six-shooter, and defendant then drawing a pistol from his pocket, and did not claim to have left the house to assist deceased, testimony that he was reproached by deceased's mother for not assisting deceased, and that a person present had said that he should not be blamed, admitted because calling for denial by witness and as reflecting upon his credibility, was irrelevant.        P. 592

16. In a prosecution for murder the erroneous admission of irrelevant evidence to discredit defendant's principal witness, and his only witness on a material point, was prejudicial, and entitled defendant to a reversal.        P. 593

Appeal from District Court, Mora County; D. J. Leahy, Judge.

Oscar Kidd was convicted of voluntary manslaughter and he appeals. Reversed and remanded, with instructions to grant a new trial.

H. W. CLARK, of San Francisco, Cal., and S. B. DAVIS, JR., of East Las Vegas, for appellant.

H. S. BOWMAN, Assistant Attorney General, for the State.

PARKER, J. The appellant, together with one Bert Jay, was indicted for the murder of Paul Tyler. Jay was acquitted and the appellant was found guilty of voluntary manslaughter. He brings this appeal.

It appears that Jay and appellant were in the town of Roy on October 14, 1915, and were preparing to leave the town for the ranch where they were then living. They hitched their team to a wagon loaded with supplies, and left it near the Tyler Hotel, which was conducted by the father and mother of the deceased. They went to the hotel for the purpose of getting some articles which they had left in the room they had occupied. Upon arriving at the hotel they were met by Sam Tyler, the father of the deceased, to whom they stated

what they wanted, and he told them to wait until he could go upstairs and get them the articles. Mrs. Sam Tyler came out of the hotel before her husband started upstairs to get the articles. She testified that as her husband was going for the articles, and after he was out of her sight, her son, the deceased, stepped out of the hotel and walked up to Bert Jay and ordered him off the premises, and that he spoke to the appellant and told him that he had been ordered away from there long ago and that he had come back, and that they had hot words; that thereupon the appellant pulled his gun and shot the deceased and then shot again; that the deceased was weakened physically by the shots, and staggered back and fell when he finally succeeded in pulling his gun, and Jay rushed in and knocked it out of his hand; that the deceased's hands were hanging down, a cigarette in one of them, his gun untouched, at the time the shooting began.

The appellant and Tyler both testified to an entirely different state of facts. They both testified that the deceased, when he came out of the hotel, walked up to the appellant, pulled his gun, and said to him, "Oscar Kidd, I am going to kill you, you God damned son of a bitch!" that Jay thereupon reached to catch the gun of the deceased, but missed it and struck the deceased's arm, causing him to drop the gun; that he and the deceased both reached for the gun, but that the deceased got it first. They both testified that appellant did not pull his gun until after the deceased pointed his gun at appellant; that he did not shoot until after the gun had been knocked out of the hand of the deceased and until he was picking the same up from the ground; that the deceased, after the first shot, straightened up and pointed his gun at the appellant, and that appellant thereupon fired the second shot; that after the second shot was fired they both ran around the corner of the hotel.

There was evidence introduced in the case tending to show illicit relations between the appellant and the wife of the deceased prior to the homicide.

State v. Kidd, 24 N. M. 572.

[1]   The first and most important question presented
in behalf of appellant is to the effect that there was no ev-
idence in the case to support the verdict of guilty of vol-
untary manslaughter.   The argument in support of this
proposition proceeds upon the theory that the evidence
for the prosecution made out a clear case of murder in
the first degree.   On the other hand, the evidence for
the defense made out a clear case of self-defense.   It is
therefore argued that there is no middle ground which
the jury could take, and that a verdict of guilty of vol-
untary manslaughter is necessarily unsupported by any
evidence in the case.   It is argued that there is no
evidence of sufficient provocation for heat of passion nor
any evidence of heat of passion in fact.   It is pointed
out that mere words are never sufficient provocation for
heat of passion, and that, so far as the evidence is con-
cerned, it is argued that there is no evidence of any-
thing but words on the part of the deceased against the
defendant. The argument in this regard is faulty. The
facts, as made out by the appellant and his witness,
show more than words; in fact, they show an assault
with a deadly weapon and a threat to then and there
kill the appellant.   It appears from the testimony for
appellant that he was about then and there to be killed
by the deceased.   This situation, together with his guil-
ty knowledge of past illicit relations with the wife of the
deceased, was sufficient, if the jury so believed, to cause
in his mind such a state of terror as to deprive him,
temporarily, of judging and viewing the situation in a
calm and reasonable manner.   All that is required is
sufficient provocation to excite in the mind of the de-
fendant such emotions as either anger, rage, sudden re-
sentment, or terror as may be sufficient to obscure the
reason of an ordinary man, and to prevent deliberation
and premeditation, and to exclude malice, and to ren-
der the defendant incapable of cool reflection.   Michie
on Homicide, p. 185.   In Johnson v. State, 22 Tex. App.
206, 225, 2 S. W. 609, the deceased had previously as-
saulted the defendant with a deadly weapon and threat-

ened his life, and on the day of the homicide defendant
was in a village near his home attending to his business
when the deceased arrived on horseback, dismounted, and
threw his hands behind him as though to his hip pocket.
Defendant started for his horse, and the deceased ap-
proached as though to intercept him and came within a
few feet. Under such circumstances the court held that
it was not error to submit the issue of voluntary man-
slaughter to the jury, and held that such conduct on the
part of the deceased was adequate cause to excite in the
mind of the defendant such terror or resentment as ren-
dered it incapable of cool reflection. In Commonwealth
v. Colandro, 231 Pa. 343, 80 Atl. 571, the appellant was
convicted of murder. He testified that he had been
threatened by the deceased that unless he paid the de-
ceased $200 by a certain time that the deceased would
kill him; that just before the homicide a messenger
came from the deceased stating that the deceased would
give him just ten minutes to come out of the house, and
that then another messenger came and informed him
that if he did not come out the deceased would come to
the house and kill him within five minutes; that the de-
fendant came out, and met the deceased, who again
demanded the money, and that the defendant became
frightened and went back into the house and put his
shotgun in the kitchen; that within a few minutes after
this the deceased came to the kitchen door and pushed
it open, and told the defendant that he was going to
kill him, and started to shoot into the room with a re-
volver; that the defendant, fearing that he was in dan-
ger of losing his life, took up his gun and fired the
fatal shot. Under these circumstances the court held
that it was error to instruct the jury that self-defense
was the only issue in the case and to eliminate the possi-
bility of manslaughter. The court cites and quotes from
many text-writers and cases, and points out that if the
circumstances are both adequate to raise, and sufficient
to justify, a belief, by an ordinary man, in the necessity
to take life in order to save oneself from death or great

State v. Kidd, 24 N. M. 572.

bodily harm, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense. On the other hand, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients· necessary to excuse the act on the ground of self-defense, the killing is manslaughter. In Johnson v. State of Wis., 129 Wis. 146, 108 N. W. 55, 5 L. R. A. (N. S.) 809, 9 Ann. Cas. 923, after citing and quoting from many cases, the court states the rule to be that the heat of passion which will reduce what would otherwise be murder to manslaughter is such mental disturbance, caused by a reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of judgment of an ordinary man as to render his mind incapable of forming and executing that distinct intent to take human life essential to murder, and to cause him, uncontrollably, to act from the impelling force of the disturbing cause, rather than from any real wickedness of heart or cruelty or recklessness of disposition. Attached to this case as reported in 5 L. R. A. (N. S.) 809, is a note collecting many of the cases upon this subject. See, also, 13 R. C. L. Homicide, § 93 et seq.

Applying some of the· considerations heretofore mentioned to the facts in the case at bar, it is apparent that there is ample evidence to sustain a conviction of voluntary manslaughter. The defendant was shown by the evidence to have been guilty of the acts tending to show his illicit relations with the wife of the· deceased, and he was shown to have had knowledge that the mother of the deceased knew of and upbraided him for such relations. He was assaulted, according to his own testimony, by the deceased with a deadly weapon, and was threatened then and there with death at the hands of the deceased. This was sufficient provocation for heat of passion, and was sufficient evidence of the· existence of heat of passion in fact, and it was therefore proper for the court to submit the issue to the jury. On the

other hand, the jury had a right to determine, as they did determine, that his plea of self-defense was not justifiable under all the circumstances, and had a right to conclude from the evidence that the defendant went to the hotel unjustifiably under all the circumstances. The line of demarcation between a homicide which amounts to voluntary manslaughter and one which amounts to justifiable homicide in self-defense, is not always clearly defined and depends upon the facts of each case as it arises. Those facts are for the jury, under instructions from the court, laying down the principles of law governing the same, as was done in this case.

[2] Appellant complains of the admission in evidence of the photograph showing the defendant and the wife of the deceased in a position calculated to indicate great familiarity between them. This photoghaph was taken in Albuquerque on an occasion when the wife of the deceased was leaving her home in Roy for California and when the defendant went there to see her before she went to California. At the time the protograph was introduced it was improperly admitted, no account being given of the same as to when and by whom it was taken or otherwise identfying and authenticating the same. Counsel for appellant vigorously protested against its introduction and moved to strike it out. The court, however, ruled against him, and the photograph was admitted. The photograph contains a seal or stamp impression upon it containing the name of P. J. Hawley, Albuquerque, N. M., in a circle near the circumference of the seal. This part of the photograph was especially objected to by counsel for the defendant. The court, however, refused to direct the jury to disregard this part of the evidence. The appellant, when he took the stand, testified that he had received a telegram from the wife of the deceased, and went to Albuquerque to give her the money to go on to California, and that while in Albuquerque they were walking on the street and passed a photograph gallery, when Mrs. Tyler suggested that they have their photographs taken, to which he ac-

ceded; that the posing of the parties was done by the photographer, and that there had never been any illicit relations between himself and the wife of the deceased.

Counsel for appellant vigorously criticizes the district attorney for introducing the photograph without first accounting for it, and urges upon this court that the case should be reversed for the erroneous admission of the same in evidence. In his argument the claim is made that the error should not be held to be cured by reason of the fact that the defendant afterwards, in testifying in his own behalf, admitted the genuineness of the photograph. It is true that the admission of the photograph was prejudicial error at the time it was admitted, but it is likewise true that the error was cured by the subsequent admission by the defendant of the genuineness of the photograph. The position of counsel for the appellant would require the court to hold that an error in the admission of evidence at one stage in the proceedings could never afterwards be cured by the admission of the adverse party of the truth of the evidence. We cannot tolerate any such doctrine, and there is no authority anywhere for the same. It is true that the defendant in this case was compelled to make an admission as to the genuineness of the photograph, by reason of its erroneous admission in evidence, which he would not otherwise have been compelled to make; but if he desired to stand upon the error, and refuse to admit the truth of the evidence, it was his duty to first present the matter to the court below, on motion for a new trial, and then, if unsuccessful, to present it to this court. A measure of hardship was thus imposed upon the defendant, but nevertheless it remains a fact that such rules of procedure are necessary in order to reach, in the ordinary trial, the ends of justice. If a trial court at one stage of the case falls into an error, every reasonable rule of waiver should be invoked in aid of the judgment, to the end that the truth may prevail. The error complained of, therefore, must be held to be waived.

[3] Appellant complains of the testimony of the mother of the deceased as to a conversation she had with the defendant and of the remarks of the court in the presence of the jury concerning the same. The testimony of the witness was to the effect that she upbraided the defendant for his conduct toward the wife of the deceased, and urged him to desist, and that the defendant said that the deceased had better quit interfering with him. The testimony was admitted by the court upon the theory that it constituted an admission by silence, by failure to deny the illicit relations between the defendant and the wife of the deceased. In denying a motion to strike the testimony, the court stated that, in his opinion, what Mrs. Tyler said to the defendant, eliciting no reply by way of denial, was of the greatest importance. In making this observation the court was not commenting to the jury as to the weight they should give to the same. It was a mere colloquy between counsel and the court as to the reason for the relevancy of the testimony. Under such circumstances the defendant cannot complain of the observation of the court, especially in view of the fact that no request was made to the court to withdraw the remark from the jury. Territory v. Taylor, 11 N. M. 588, 71 Pac. 489; Territory v. McGrath, 16 N. M. 202, 114 Pac. 364.

[4] The mother of the deceased was allowed to testify that the wife of the deceased refused to leave the town of French, where she had gone, and that her husband had to go up there. Objection is made by appellant to this testimony on the ground that it appears that the witness could not have personal knowledge of the fact that the wife of the deceased refused to leave the town of French. The witness was asked the question: "Did you have any conversation with her from French?" An objection was interposed by counsel for appellant to any communications between the witness and the wife of the deceased from French. The ground of the objection is not stated. By leave of the court, counsel for defendant then cross-examined the witness,

but he contented himself with showing that during all the time the wife of the deceased was in French she, the witness, was in the town of Roy. He did not examine the witness as to whether she had had telephonic communication with the wife of the deceased, or communication by means of letters, either of which might well have qualified the witness to testify as she did. Under such circumstances, we cannot understand how appellant is in a position to complain of the testimony.

[5] The mother of the deceased testified that appellant's codefendant, Bert Jay, was acting as a go-between, meaning a bearer of communications, between appellant and the wife of the deceased. The witness was testifying to the fact that she had ordered Jay to leave the hotel, and stated that she had caught him on three or four occasions talking to the wife of the deceased, and when the witness would go into the dining room Jay would sneak out and the wife of the deceased would go back into the kitchen. She was then asked why she ordered Bert Jay to leave the house, and she answered: ''On that very account; because he was acting as a go-between.'' It is apparent that the witness was merely giving her reasons for ordering Jay to leave the hotel, and was not testifying to the fact that he was a go-between between defendant and the wife of the deceased. The effect of her testimony was that she ordered him away from the hotel because he was secretly talking to the wife of the deceased, from which she inferred that he was a news-carrier between the two. The testimony is not strictly admissible, and should, perhaps, have been stricken out on the motion of appellant. But this is a case of harmless error. All the circumstances which caused the witness to order Jay from the hotel are given in her testimony, and was of as much force without her conclusion as with her conclusion that he was a go-between. The facts to which she testified tended to show that he was a news-carrier between the parties, and, that being the case, the defendant was not harmed by the testimony. The witness was not asked by counsel for appel-

lant whether she was expressing her opinion, or
she knew from other and independent sources that Jay
was a news-carrier, as she inferred. The testimony is
exceedingly remote from the appellant, and was, at the
time it was given, directed against the man Jay, who
was at the time a defendant on trial with the appellant.
Under such circumstances, the error is not reversible
error. In fact, counsel admits in his brief that this evi-
dence had little probative value.

[6] The mother of the deceased was allowed to tes-
tify, over objection, as to her statements to a witness,
Scott Arnold, and as to statements made by a Mrs.
Farmer on that occasion. The witness Scott Arnold had
testified for the appellant that on the morning of the
homicide he was inside the hotel in front of which it
occurred and heard a shot. He went to the door, and
looking out, saw the deceased reaching for his pistol,
which was on the ground, trying to pick it up. The ap-
pellant at that moment was pulling his gun from his
hip pocket. This testimony was introduced by appel-
lant for the purpose of corroborating his testimony to
the effect that he had not drawn his pistol when the
first shot was fired by the deceased, and that conse-
quently the first shot must have come from the pistol
of the deceased. The witness was cross-examined by
the district attorney, and an attempt was made thereby
to demonstrate that he did not come out of the hotel,
and could not have seen what he testified to, for the
reason that his mother, when the shooting began,
grabbed him and held him until after the shooting was
over. He then asked the witness whether the mother
of the deceased did not come into the room where the
witness Arnold and where his mother and Mrs. Farmer
were, and say to him, "If you had not been cowardly
and would have gone out, Paul [the deceased] need not
have been shot," and whether Mrs. Farmer did not
thereupon state to Mrs. Tyler, "You must not blame
Scott, because his mother was holding him and he could
not go." The witness denied the statements. In re-

buttal the prosecution called the mother of the deceased to testify to the truth of the above facts. The testimony was objected to upon the ground that the same was hearsay, and upon the ground that the same was immaterial and irrelevant, and that the state was therefore bound by the answer of the witness Scott Arnold. The testimony is neither immaterial nor irrelevant nor is it hearsay. It is testimony reflecting directly upon the whereabouts of the witness at the time of the homicide. He had testified that he first heard the report of the gun, then went to the door, and saw the remainder of the controversy. The testimony showed that shortly after the homicide he was confronted with the proposition by the mother of the deceased that he was a coward or he would have gone out and helped her son defend himself, and that the woman, Mrs. Farmer, made the excuse for him that he could not go out because he was held by his mother. The situation called for him to speak as to why he had not gone out to the assistance of the deceased, and as to whether he was or was not a coward, as proclaimed by the witness. It reflected directly upon his veracity as a witness when he tesified that he heard the shot and saw the appellant draw his gun from his hip pocket after the shot had been fired.

[7] The witness Scott Arnold was cross-examined for the purpose of laying the foundation for impeachment. He was asked whether he had met Leo Tyler in the street just a few minutes after the shooting, and whether he did not at that time state to Tyler that there had been a shooting but that he knew nothing about it because he was inside with the door shut and could not see. The witness' answered in the negative. He was then asked if he made substantially the same statement to Dean Tyler, and he answered in the negative. He was then asked if he did not tell the same thing to Mr. and Mrs. Tyler, and he likewise answered in the negative. Mr. Tyler, the father of the deceased, was put upon the stand in rebuttal, and asked whether the witness Arnold had told him that he was in the kitchin with

the door shut and that he did not see anything of the difficulty. The question was objected to on the ground that the proper foundation for the impeachment had not been laid, the time and place of the alleged statements not having been pointed out. The court, in overruling the objection, took the view that the circumstances were sufficiently developed to designate the occasion upon which the statements had been made. The witness was allowed to answer, and he stated that Arnold made the admission above quoted. Under all the circumstances, and taking into consideration the examination of the witness which immediately preceded the question, and the answer objected to, we think the foundation for the impeachment was properly laid. The question directed to the witness Arnold as to his alleged admission to the father and mother of the deceased, in the connection in which it occurred, properly and sufficiently fixes the time and place of the admission.

[8] The witness Dean Tyler testified to statements made by the witness Scott Arnold a short time before the shooting occurred, according to the transcript. An examination of the transcript discloses that an evident error crept into the question asked. The context shows that the question was intended to relate to a conversation shortly after the shooting. The question is as follows: ''Did the boy, Scott Arnold, a short time before the shooting of your brother Paul, say to you at Roy that he was in the kitchen with the door shut when the shooting took place and did not see anything?'' This was an error in the question which evidently escaped the notice of both the district attorney and the court. But it is clear from the surroundings and the course of the examination at the time that the witness, when he answered in the affirmative, the district attorney, and the court all understood the question to relate to a short time after the shooting.

[9] Counsel for appellant complains of the refusal of the court to allow the defense to prove the attitude of the father and mother of the deceased toward

the appellant immediately after the shooting. Upon objection being interposed, counsel for appellant stated to the court that he expected to prove by the witness that at the time of the arrest and immediately after the arrest of the appellant that Samuel Tyler, the father, and Mrs. Tyler, the mother, of the deceased, made demonstrations of violence and of threatened violence against the appellant; that the father attempted to assault the appellant with a pistol, and that he was disarmed. The offer was made, it was stated, for the purpose of showing animosity, ill feeling, and mortal hatred on the part of the father and mother of the deceased against appellant. The offer was objected to by the district attorney on the ground of immateriality. The court rejected the offered testimony upon the ground that the father and mother of the deceased had not been questioned while on the stand as to whether they had any ill feeling towards appellant. The reason assigned by the court was probably not a valid reason for the exclusion of the testimony. See Burnaman v. State, 70 Tex. Cr. R. 361, 159 S. W. 244, 46 L. R. A. (N. S.) 1001; 2 Wigmore on Evidence, §§ 943–953.

There is another reason, however, appearing from the record, which renders the erroneous action of the court not available here. It appears from the transcript that two witnesses, Ethel Harper and John O. Gallegoes, testified to the attempted assault upon the appellant with the pistol. This testimony was uncontradicted by the Tylers or otherwise. It became, from that time on, an uncontested fact in the case. The testimony which was excluded by the court, would be nothing more than cumulative under the circumstances, and its rejection was immaterial and harmless. Cooper v. State, 123 Tenn. 37, 138 S. W. 826.

[10] Counsel for appellant complain of the refusal of the court to admit in evidence two cartridges found at the place where the shooting occurred two days after the homicide. There was a controversy throughout the trial as to whether the deceased shot

one or two shots, the defense claiming that he shot twice.
The shells offered were of the caliber and kind used in
the 45 six-shooter, such as the deceased had on the oc-
casion, and were not of the kind suitable for use in
the automatic pistol carried by the appellant. The
court excluded the evidence upon the ground that they
were found two days after the shooting, and were not
otherwise in any way accounted for, and upon the
ground that the shells "were not fired from an auto-
matic pistol, or any pistol, nor from any firearm that
would of itself, or automatically, eject the shells." While
it appears that the cartridges were found in front of
the hotel two days after the homicide, where persons
were passing and entering the hotel, and where all the
opportunities necessary existed for any person to put
shells upon the ground for the purpose of manufactur-
ing proof in the case, still it may be that they were not
irrelevant on that account, the circumstances going
merely to the weight of the evidence. But this evidence
was irrelevant from another standpoint. As before
seen, the deceased was using an old-fashioned 45 Colt's
six-shooter, which did not automatically eject the shells
when fired. The description of the immediate circum-
stances surrounding the homicide is such that it was im-
possible for the deceased to have unloaded his gun by
ejecting the empty shells during the controversy. The
shells, therefore, if they did come from the six-shooter of
the deceased, were extracted subsequent to the contro-
versy, the appellant and his codefendant Jay having
left the scene before the deceased had opportunity to re-
load his gun, according to the testimony. There was
no proof offered in the case that the deceased did un-
load his gun in front of the hotel after the controversy,.
or at all, and, for all that appeared in the evidence,
the empty shell or shells from which shots were fired
by him may still be in the six-shooter or elsewhere, the
record being silent on this subject. The evidence for the
prosecution clearly shows that the deceased voluntarily
fired one shot at appellant. The claim is not made by

appellant that more than one shot was fired deliberately by the deceased, but that the first shot was accidentally fired by reason of the hand of the deceased being struck by the codefendant, Jay. It is further to be observed that the proof was offered to show the bald fact that deceased's gun was fired twice, and not to show the order in which the firing took place, or the actions of the deceased at the time. No proof was tendered in regard to the condition of the gun as to loads therein at the beginning or the end of the difficulty. No proof was tendered to show that the shells had been recently fired. Hence there is a hiatus between the proof and the fact sought to be established, viz. that deceased shot twice. It became irrelevant, therefore, to show that two empty shells suitable for use in deceased's six-shooter were found upon the scene of the homicide, at least for the purpose for which the proof was offered, and the court properly excluded the evidence, even if some of his reasons for his action were not sound.

[11] The deceased made a dying declaration which was admitted in evidence by the court. A controversy over the admissibility of the evidence arose over the difference of opinion as to the mental capacity of the deceased to make the declaration. The witness Clarence Wright, to whom the dying declaration was made, testified that after the deceased had been operated upon he was with him in the hospital, and that he regained consciousness in about an hour after the operation. He testified that the deceased expressed belief in his imminent and pending death, and then described to the witness the circumstances of the shooting. It is to be conceded that the foundation for the introduction of the dying declaration was rather meager in character and detail. The objection interposed was based upon two grounds: First, that no foundation had been laid; and, second, that it appeared from the testimony of physicians that the deceased was in a semicomatose state before and after the operation, and that consequently it affirmatively appeared from the testimony of

the physicians that the deceased was not in a condition to make a credible statement. An examination of the testimony fails to disclose that the testimony of the physicians covered the entire period from the time of the operation until the death of the deceased. The witness to whom the declaration was made testified that the deceased regained consciousness and was conscious of impending death. Counsel for appellant did not ask to be allowed to cross-examine the witness as to the condition of the declaration, but simply relied upon the condition of the record as not showing his competency. The testimony as to the condition of the declarant would seem to be sufficient, under the circumstances, it not being developed by cross-examination or otherwise that the declarant was incompetent.

[12] Appellant complains of the admission by the court of the testimony of the witness Floersheim as to statements made by the codefendant, Bert Jay, without limiting the same to Jay, and without instructing the jury not to consider the same to the appellant. At the time the testimony was offered it was objected to on the ground that it was not shown that the statement was a voluntary statement, and upon the ground that it was the statement of Jay, and could not in any manner be used against the appellant. The testimony was entirely competent at the time it was introduced. If it were competent as to Jay, there was no objection which could be made which would require its exclusion. The proper method for counsel to have pursued would have been to request the court to limit the testimony to the defendant Jay to the exclusion of the appellant. This was not done and no error can be assigned here for that reason.

[13] A witness testified that the reason why the deceased and wife returned from Dawson to Roy was because the deceased's wife did not like it in Dawson. The testimony was objected to, and a motion to strike it out was made upon the ground that its only purpose was to impeach the witness and no foundation had been laid for it. Appellant is not in a position to take ad-

vantage of the error complained of, if there was error. He made no objection to the questions when asked, but speculated upon the nature of the answer, and, then after the answer had been given, moved to strike it out. This, of course, is not allowable. State v. Ellison, 19 N. M. 428, 144 Pac. 10.

[14] Appellant complains of the refusal of the court to take from the jury the testimony of the witness as to the contents of a letter received by her from the wife of the deceased. The question, when propounded as to the contents of the letter, was objected to because it called for secondary evidence, the original not being accounted for. Thereupon the court interrogated the witness, who stated that she did not have the letter and did not know where it was. Counsel for appellant then interrogated the witness whether she had looked for the letter and she said that she had not. She still maintained, however, that the letter was not in her possession or under her control. Thereupon the objection to the question was overruled and the witness answered. Thereupon counsel for appellant moved to strike the testimony upon grounds: First, that the writer of the letter, when on the stand, was not interrogated concerning the same; and, second, that no foundation was laid for the introduction of secondary evidence of the contents of the letter. The court denied the motion. The former ground of the motion to strike out the testimony cannot be considered here, for the reasons that it was not brought to the attention of the court until after the witness was allowed to testify to the contents of the letter. As to the latter ground of the motion, we think the foundation for secondary evidence of the contents of the letter was sufficiently, even if somewhat meagerly, laid. The witness testified positively that she did not have the letter, and that it was not at her house, although she admitted that she had not looked for the letter. Cross-examination of the witness was not pursued by counsel for the defense sufficiently to develop the fact that the witness was suppressing the

original letter; but, on the other hand, her testimony as a whole shows that she did not have the letter in her possession nor under her control. For these reasons appellant cannot avail himself of any alleged error in this regard.

The foregoing disposes of all the points raised by appellant. It has been seen that many of them are of a minor character, and in fact counsel for appellant state that it is only on account of their number rather than their quality that they ask the court to reverse the case. The principal point relied upon is that the evidence does not warrant a conviction of voluntary manslaughter. We have heretofore pointed out that it does warrant such verdict. It follows that the judgment of the district court should be affirmed, and it is so ordered.

HANNA, C. J., and ROBERTS, J., concur.

## On Rehearing.

PARKER, J. A rehearing has been allowed, and counsel have argued all of the points originally presented to the court. With the treatment which most of them received in the original opinion we are entirely satisfied.

[15] We are not satisfied, however, with the sixth paragraph of the opinion, and are convinced that we were in error therein. Laying aside for the moment the question as to whether the statements of Mrs. Tyler and Mrs. Farmer were made under such circumstances as to require an answer from the witness, Arnold, which may be doubted, there is another fatal objection to the evidence. The cross-examination of Arnold and the testimony of the two women was to show that he did not go out to the rescue of the deceased, and the reasons why he did not go. But the witness had not claimed to have gone out or attempted to go out of the house. He had merely claimed to have gone to the door and to have looked out and seen all he related. This action on his part was entirely consistent with everything stated by the two women. The statement by the mother

of deceased that she upbraided the witness for his cowardice in no way contradicted him in anything he had said, and was wholly irrelevant and highly prejudicial to the standing of the witness before the jury. The statement of Mrs. Farmer that witness' mother held him so he could not go out to the rescue of the deceased in no way contradicted the witness, and was entirely consistent with his testimony that he went to the door, but not out of it. The testimony was therefore irrelevant and prejudicial.

[**16**] This witness was the principal witness for the appellant, and was the only witness as to the vital point testified about, aside from the appellant and his codefendant. To have him discredited in this unjustifiable manner was highly prejudicial to the appellant and entitles him to a reversal of the case. The objection made by counsel at the time fully covered this phase of the case, but they were not fully appreciated by the court when the original opinion was written.

For the reasons stated, the judgment of the court below will be reversed, and the cause remanded with instructions to award a new trial and it is so ordered.

HANNA, C. J., concurs.

ROBERTS, J. (concurring specially). Counsel for appellant strenuously insist that the ruling of this court that there is proof in the record upon which to base the verdict of manslaughter is erroneous. If it be assumed, for the sake or argument, that the vedict of the jury should have been "guilty of murder in the first degree," or "not guilty," and that there was no evidence justifying a verdict of manslaughter, nevertheless appellant would not be entitled to reversal on this ground for two reasons: First, in the court below he sat by, and without objection permitted the court to instruct the jury on the subject of manslaughter. If, in fact, there was no evidencce justifying such instruction, it was his duty to have objected to the giving of the same. State v. Gonzales, 19 N. M. 467, 144 Pac. 1144; State v. Mc-

Knight, 21 N. M. 14, 153 Pac. 76. Second, a defendant in a prosecution for homicide cannot complain that he was convicted of a lower grade of offense than the evidence showed him to be guilty of. Michie on Homicide, vol. 2, § 342. Since the jury found that appellant unlawfully killed the deceased, the presumption is that had they not found him guilty of manslaughter they would have found him guilty of murder; hence the appellant is not in a position to complain, since he was not prejudiced by reason of the verdict finding him guilty of the lesser crime. This proposition is supported by numerous cases. People v. Tugwell, 32 Cal. App, 520, 163 Pac. 508; Bennett v. State, 95 Ark. 100, 128 S. W. 851; Spence v. State, 7 Ga. App. 825, 68 S. E. 443; Brown v. State, 31 Fla. 207, 12 South. 640; Serna v. State (Tex.) 105 S. W. 795; State v. Perry, 78 S. C. 184, 59 S. E. 851; State v. Owens, 79 S. C. 125, 60 S. E. 305; State v. Henderson, 80 S. C. 165, 60 S. E. 314; Rolls v. State, 52 Miss. 391; Murphey v. People, 9 Colo. 435, 13 Pac. 528. For these reasons we shall give no further consideration to this point.

A more serious question is suggested, however, which is that the ruling of this court holding admissible the testimony of Mrs. Tyler as to statements which she heard Mrs. Farmer make after the homicide, Mrs. Farmer not being called as a witness, was erroneous. The proceedings in the trial court bearing upon this point are stated in the former opinion in this case. In the former opinion we said concerning this testimony.

"The testimony is neither immaterial nor irrelevant, nor is it hearsay. It is testimony reflecting directly upon the whereabouts of the witness at the time of the homicide."

Upon further consideration we believe that this statement is inaccurate. While it is true it was testimony bearing upon the whereabouts of the witness at the time of the homicide, it was hearsay testimony. Hearsay evidence is evidence offered by a witness whose testimony consists of a narration of what other persons have com-

State v. Kidd, 24 N. M. 572.

municated to him concerning the material and relevant facts. In the trial of this case the whereabouts of the witness, Scott Arnold, became a relevant fact, and this fact was permitted to be proved by evidence of a state- ment made by Mrs. Farmer after the transaction as to the whereabouts of the witness. Mrs. Farmer was not put upon the stand, but evidence of her statement as to where she said Scott Arnold was at the time of the shooting was permitted to be given by a third party. This evidence being permitted, the right to cross- examine Mrs. Farmer was denied the appellant.

In the case of Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262, the following was said:

"No proper foundation was laid for the question propound- ed to the surgeon as to who pointed out and identified to him the body he examined as that of John F. Turner. He had previously stated that he did not personally know the de- ceased, and did not recognize the body to be his; he did not know that it was the body which the father of the deceased desired him to examine; consequently his answer could only place before the jury the statement of some one, not under oath, and who, being absent, could not be subjected to the ordeal of a cross-examination. The question plainly called for hearsay evidence, which, in its legal sense, 'denotes that kind of evidence which does not derive its value solely from the credit to be given to the witness himself, but rests also, in part, on the veracity and competency of some other per- son.' 1 Greenleaf, Ev. § 99; 1 Phil. Ev. 169. The general rule, subject to certain well-established exceptions as old as the rule itself, applicable in civil cases, and therefore to be rigidly enforced where life or liberty is at stake, was stated in Mima Queen v. Hepburn, 7 Cranch, 290, 295 [3 L. Ed. 348], to be 'that hearsay evidence is incompetent to establish any specific fact, which fact is in its nature susceptible of being proved by witnesses who speak from their own knowledge.' 'That this species of testimony,' the court further said, speaking by Chief Justice Marshall, 'supposed some better testimony which might be adduced in the particular case is not the sole ground of its exclusion. Its intrinsic weakness, its in- competency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is inad- missible.' The specific fact to be established by proof of what some one else said to the surgeon as to the identity of the body submitted to his examination was that it was the body of John F. Turner. What Fowler, who was not even shown to have been placed in charge of the body, nor commissioned

to deliver it to the surgeon, nor to be acquainted with the deceased, said, in the absence of the prisoner, as to the identity of the body, was plainly hearsay evidence, within the rule recognized in all the adjudicated cases."  .

The fact that the district attorney attempted to prove was, as stated in the former opinion, that Scott Arnold, a very important witness for the defense, "could not have seen what he testified to, for the reason that his mother, when the shooting began, grabbed him and held him until after the shooting was over." The state did not attempt to  prove this by calling Scott Arnold's mother, who could have given direct evidence, on the subject, nor by calling Mrs. Farmer, who made the statement, but by calling Mrs. Tyler, who had no personal knowledge whatever of the matter, and permitting her to testify as to what she heard Mrs. Farmer say about it. Certainly Mrs. Tyler's evidence was a narration of what another person communicated to her concerning a relevant fact within the definition of hearsay. Her statement as to the whereabouts of Scott Arnold "does not derive its value solely from the credit given to the witness himself, but rests also, in part, on the veracity and competency of some other person," within the rule given in Hopt v. Utah. The value of her statement rests entirely upon the veracity and competency of Mrs. Farmer, who was not called, whose statement was never made in court nor under oath, nor subject to cross-examination by the party against whom it was offered.

. The defendant was entitled to know the source of Mrs. Farmer's statement. There is nothing in the record to show that Mrs. Farmer had any personal knowledge on the subject, nor that she was in fact present at the time, to which her statement to Mrs. Tyler related. For all that appears, Mrs. Farmer might have been repeating statements made to her by some one else, who, in turn, knew nothing about it. Certainly defendant and his counsel were entitled to have Mrs. Farmer produced, to cross-examine her as to her source of knowledge

of the facts which she related, to have the jury consider her manner and bearing as she told her story.

It cannot be claimed that the testimony was admissible as impeaching. While a witness may be impeached by showing that he has made contradictory statements, in this case no ground was laid for impeaching evidence. For this reason we think that the court erred in admitting this testimony.

We are further of the opinion that we were in error in the former opinion in holding that the trial court was correct in excluding the cartridges found at the scene of the shooting. While this evidence may have had but slight value, by reason of the public place in which the cartridges were found, still we believe that the weight to be given to the evidence was for the jury. The question as to whether deceased had fired one or two shots was one of the disputed questions in the case. The evidence on behalf of appellant was to the effect that he had fired two shots, and the offered evidence was to the effect that two empty cartridge shells were found near the scene of the shooting, of the same caliber of the revolver used by the deceased.

"Articles found at or near the scene of the homicide, subsequent thereto, which are apparently connected with and tend to explain it, are admissible, although not otherwise connected with the accused." 6 Ency. of Ev. p. 669.

In the case of Horn v. State, 12 Wyo, 80, 73 Pac. 705, the state was permitted to introduce in evidence empty cartridges of the same caliber as defendant's revolver, although found two weeks after the homicide, about two miles from the scene thereof, on a public highway. It was the theory of the prosecution that the defendant had traveled over this highway in his flight. Other cases will be found in the notes in 6 Ency. of Evidence, pp. 669, 670. We think that this evidence should have gone to the jury, and that it was for the jury to determine its weight.

For these reasons I concur in a reversal.