**70 P.(2d) 152**

**STATE v. INMAN.**

No. 4253.

Supreme Court of New Mexico.

June 21, 1937.

W. A. Sutherland, of Las Cruces, C. C. Royall, of Silver City, and J. C. Gilbert, of Roswell, for appellant.

Frank H. Patton, Atty. Gen., for the State.

HUDSPETH, Chief Justice.

Aron L. Inman was charged with first-degree murder for the killing of Robert Ake. Upon the trial he was convicted of voluntary manslaughter and sentenced to serve from nine to ten years in the penitentiary. From the judgment and sentence of the court this appeal is prosecuted. The court, over the objection of the defendant, instructed the jury on voluntary manslaughter. This is assigned as error.

The material facts are: The deceased and defendant were cattlemen occupying adjoining ranges in Catron county. Ill feeling had existed for years, and on July 16, 1935, the defendant ordered the deceased off the ranch of which he was manager, whereupon the deceased challenged the defendant to "fight it out" with rifles, saying: "Inman, the next time I see you I am going to have my thirty and By God, you had better have yours." There was evidence that the deceased had been lying in wait alongside a trail which the defendant frequently traveled and of threats made by the deceased and communicated to defendant. On August 6th, three weeks after

the threat or challenge of July 16th, the defendant drove into Beaverhead, a small village which had a weekly mail service and at which many of the residents of the sparsely settled mountain region tributary to Beaverhead assembled on Tuesday of each week, the day of the arrival of the mail. He stopped his truck some 40 to 50 feet from the point in the street at which the deceased was standing. The defendant testified: "When I stepped out of my car, Bob Ake was kind of facing me. He gave me a hard look and turned toward the car parked in front of the Post Office gate. I then grabbed my gun out of the seat of my car and fired as quick as I could. I fired the shot because I thought that Mr. Ake had started to that car to get a gun. When I fired, he fell over backwards. Then he threw his right hand across his body (Indicating) and looked at me and said 'God damn you' and attempted to get up, and I fired again as soon as possible. * * *" The defendant had previously testified as follows: "The disclosure to me of these facts and threats affected me as to my feeling of safety and peace of mind. I can't explain it, it was a feeling I never had before. I don't believe I can explain it. It caused me to take all precautions I knew how to take, and tend to my business. I taken someone with me wherever I went, and I did not ride alone anymore in that country. When I did ride I looked behind everything I passed, brush, rocks. I did not run any risks. I would not have been surprised to have seen Mr. Ake anywhere up that river. I had no reason not to know Mr. Ake was not well acquainted with that river and its places of exposure. He knew as well as I did. I persisted in my feeling of anxiety very much. After the 16th of July I next saw Ake on August 6th, that was Tuesday. On that day I went to Beaverhead Post Office. * * *" And on cross-examination the defendant testified as follows: "After I shot Ake I went into the house to tell Bud Sheff to call the Sheriff and to get a drink of water. I probably was a little thirsty. I don't know whether I was excited or not, I suppose I was. I had been expecting this so long, I expect I was not. I had been expecting this a long time before it happened. I didn't shake hands with my friends that I remember of. I wouldn't say positively, but I don't remember. That is my rifle. (Shown by District Attorney). That is the one that shot Bob Ake. State's Exhibit A I believe is the one. That is a 30-30. I have no other explanation of why I shot that second shot. I fired the first shot to save my own life and I fired the second one to save my own life."

The question to be determined is whether or not the facts bring the case within the rule to the effect that the defendant was in such "terror" that it constituted "heat of passion" as defined in State v. Kidd, 24 N.M. 572, 175 P. 772 and followed in other cases, the last being State v. Simpson, 39 N.M. 271, 46 P.(2d) 49, 50. The defendant relies upon State v. Hunt, 30 N.M.

273, 231 P. 703, maintaining that the facts in the case at bar are similar to those in the Hunt Case, where we held that "It is error, requiring reversal, to submit * * * a degree of unlawful homicide not within the proofs, and over the objection of the defendant."

It is also pointed out that under all the authorities three weeks is a sufficient "cooling time" and that the evidence supports the theory that the defendant at the time of the homicide displayed the utmost coolness and deliberation. It is true that no time was wasted after the defendant arrived at the scene of the homicide, but he testified that he shot to save his own life. "I fired because I thought that Mr. Ake had started to that car to get a gun." This plea of self-defense was based upon the immediate danger.

Defendant's brief states: "The jury did not believe the self defense story as shown by their verdict. If they did not believe this defense clearly there was no other verdict for them than murder." The facts in the case at bar are quite similar to those in State v. Simpson, supra, where we said: "The verdict thus represents the conclusion that the provocation for terror was not sufficient to justify the killing, but was sufficient to raise a reasonable doubt that appellant slew in malice." This language is applicable here, and the rule in the Simpson Case is controlling in the case at bar. The defendant's able counsel strenuously argue that the Hunt Case, as well as the weight of authority in other jurisdictions,

is contrary to this rule. The rule was adopted after thorough consideration and we see no reason to depart from it now. A discussion of the question as to whether the Simpson decision overruled State v. Hunt, supra, would serve no useful purpose in view of the promulgation of Trial Court Rule 35—4453 and the enactment of chapter 199, Laws 1937, now effective. A careful reading of the record and thorough consideration of the arguments of defendant's counsel leave us with the conviction that the defendant had a fair trial and that the verdict should stand.

Finding no error in the record, the judgment and sentence of the district court will be affirmed, and it is so ordered.

SADLER, BICKLEY, BRICE, and ZINN, JJ., concur.