442 P.2d 594

STATE of New Mexico, Plaintiff-Appellee,

v.

Antonio LOPEZ, a/k/a Tony L. Montano, Defendant-Appellant.

No. 8496.

Supreme Court of New Mexico.

June 3, 1968.

Rehearing Denied July 15, 1968.

**283**

David E. Douglas, Charles H. Fowler, Socorro, for defendant-appellant.

Boston E. Witt, Atty. Gen., Paul J. Lacy, Asst. Atty. Gen., for plaintiff-appellee.

## OPINION

MOISE, Justice.

Appellant was charged with first degree murder and was convicted of voluntary manslaughter.

■ There is some confusion and conflict in the proof as presented at the trial. However, our review of the facts is limited to a determination of whether the verdict is supported by substantial evidence when viewed in a light most favorable to the State, and with all permissible inferences indulged in support of the verdict. State v. Weber, 76 N.M. 636, 417 P.2d 444 (1966);

State v. Crouch, 75 N.M. 533, 407 P.2d 671 (1965). With this in mind and in this light, we briefly review the pertinent facts.

On the night of the offense appellant was eighteen years of age and was working as an attendant at a filling station in Socorro. During the evening decedent, who was a long time acquaintance and friend, and about appellant's age, pulled into the filling station and proceeded to cuss appellant for no reason known to appellant, although appellant admits previous difficulty with decedent. Later that same evening decedent, with two companions in his car, pulled into the driveway at appellant's home immediately behind appellant's car, got out, walked over and opened the left-hand door next to where appellant was sitting behind the wheel of his car, and almost instantly a shot was fired and decedent fell. Decedent's two companions went to where decedent had fallen and, although some disagreement exists as to what was then said by appellant, there is testimony that he said to one of decedent's companions, "Get him out of my yard," and "Do you want to die, too, fat man?" Appellant testified that he did not intend to shoot decedent; did not know how or why the gun went off, but that decedent had grabbed hold of his jacket and right arm in such a manner as to possibly cause it to discharge. Appellant testified that he and his half-brother had come from the K.C. Hall to appellant's home where their father had directed them to pick up a gun which he had left there that afternoon and bring it to him at the Hall; that they had taken the gun and placed it on the front seat of the car between the two of them; that when they couldn't start the car to return to the K.C. Hall they were about to return the gun to the house because they did not want to leave it in the car; and that it was just at this instant that the car door was jerked open and appellant was grabbed by decedent.

Concerning his feelings at the time, appellant testified, as disclosed by the following excerpts:

"Q Were you afraid of Jimmy?

284

A Not in any special way that I know of.

Q You didn't fear that Jimmy would kill you or anything?

A No sir.

Q You weren't afraid of meeting him on the street, were you?

A No sir.

Q Then you wasn't [sic] in fear of your life, were you?

A Not exactly, no sir. I wasn't in fear of my life.

* * * * * *

Q Tony, you testified on direct and again on cross examination as to this incident that happened at Polvadera, and I believe you said you weren't afraid of Jimmy, is that right?

A Yes sir, I was not.

Q What do you mean you weren't afraid of him?

A Well, not actually afraid of him.

Q At the time that happened in Polvadera you said he pulled a knife on you; were you afraid then?

A No sir.

Q Not afraid at all?

A Not at that time. They were acting like buddy-buddies with me.

Q When he pulled the knife, what did you think then?

A I thought that's the time to be scared, right then.

Q You were scared right then?

A Yes sir. But when you are walking out with them, and they seem to be your buddies, you're not actually afraid.

Q You said you weren't scared, you were scared right then, weren't you?

A Right then, at that moment, yes sir.

Q You were afraid you were going to get hurt?

A Yes sir.

Q What was your reaction when somebody suddenly jerked you out of the car?

MR. WAGGONER: Wait a minute, he wasn't jerked out of the car, I don't think.

MR. DOUGLAS: I believe he testified he was jerked out of the car, partly out of the car.

MR. WAGGONER: You might rephrase your question.

Q What was your reaction when you were jerked partly out of the car?

A I was shocked.

Q What was your reaction then? At that time were you frightened, or how did you feel?

A Yes sir. When you have been pulled out of a car and you don't know who it is, you're going to be kind of scared, when somebody comes up behind you.

Q You said you weren't scared of Jimmy, you meant just as a * * *

A I mean when you see a person face to face you're not actually afraid of him unless he tries to pull something on you.

Q At the time that these incidents happened, you mean you were not scared? When he pulled the knife on you?

A I was scared at the moment that he pulled it out.

Q What was your reaction when he tried to pull you out of the car?

A I imagine I was scared then."

Further, it appears that at the hospital, upon being asked by a police officer concerning what happened, appellant answered, "I shot him" and when asked, "How come?" he replied, "He was trying to beat me up."

Appellant requested and the court gave an instruction stating the appellant was entitled to a defense of self-defense. The jury was fully instructed on the law of self-defense which was in no way objected to by appellant.

■ Although appellant moved at the close of the State's case as well as at the close of all testimony, and by motion for a new trial after verdict, to dismiss the charges because of a failure of proof to support a conviction of murder either in the first or second degree or of manslaughter, no objection to the jury being instructed on manslaughter along with the two degrees of murder was stated in the record. This has many times been held to constitute a waiver of errors or defects in the instructions. See State v. Hatley, 72 N.M. 280, 383 P.2d 247 (1963); State v. Kidd, 24 N.M. 572, 175 P. 772 (1918).

However, aside from any question concerning the right to have a review of matters waived by failure to object, we note appellant's principal complaint is to the effect the facts are not such as will support a verdict of voluntary manslaughter, which is defined in § 40A-2-3, N.M.S.A.1953, as follows:

"Manslaughter is the unlawful killing of a human being without malice.

"A. Voluntary manslaughter consists of manslaughter committed upon a sudden quarrel or in the heat of passion.

"Whoever commits voluntary manslaughter is guilty of a third degree felony.

"B. * * *."

We find appellant's position to be untenable. The argument is identical with the one advanced in State v. Wright, 38 N.M. 427, 34 P.2d 870 (1934), and there held to be without merit.

In that case the following was quoted from State v. Kidd, supra:

"All that is required (*to make of the killing manslaughter*) is sufficient provocation to excite in the mind of the defendant such emotions as either anger, rage, sudden resentment, or terror as may be sufficient to obscure the reason of an ordinary man, and to prevent deliberation and premeditation, and to exclude malice, and to render the defendant incapable of cool reflection."

We also quote the following from State v. Wright, supra:

"Clearly, the jury was justified on Wright's own admissions in believing that Wright killed Foster while under the influence of an uncontrollable fear of death or great bodily harm. Under the circumstances the act is not excused on the ground of self-defense, but on the contrary brought the homicide charged against the appellant within the degree of voluntary manslaughter. State v. Kidd, supra."

In State v. Kidd, supra, it was stated:

"* * * The line of demarcation between a homicide which amounts to voluntary manslaughter and one which amounts to justifiable homicide in self-defense, is not always clearly defined and depends upon the facts of each case as it arises. Those facts are for the jury, under instructions from the court, laying down the principles of law governing the same, as was done in this case."

■ From this it is quite apparent that when facts are present which give rise to a plea of self-defense, it is not unreasonable that if the plea fails, the accused should be found guilty of voluntary manslaughter. Compare State v. Wright, supra.

■ We have not overlooked appellant's argument that the killing was accidental, based upon his testimony that he did not intend to pull the trigger, and didn't intend to shoot. That an accidental killing will not support a conviction of voluntary manslaughter goes without saying. However, just because the appellant testified to this effect does not make it so. The evidence is not undisputed, as contended by appellant. The surrounding circumstances as proved at the trial may properly be considered in arriving at a conclusion as to the facts. Decedent's companions related how they saw the incident, and what transpired immediately following. Appellant's explanation of his relations with decedent; of why he had the gun and what

he was doing with it when it discharged, and his reactions at the time, are inconsistent with the statement made to the police, and appellant's defense was evidently not believed by the jury. We cannot say that proof was not present sufficient to establish beyond a reasonable doubt in the minds of the jury that appellant did shoot and kill decedent upon a sudden quarrel or in the heat of passion, and was guilty of voluntary manslaughter. See Annot., 5 L.R.A.(N.S.) 809 (1907).

We fully recognize the rule to be as argued by appellant and as stated in State v. Trujillo, 27 N.M. 594, 203 P. 846 (1921), that it is error for the court to submit to the jury an issue of whether defendant was guilty of voluntary manslaughter when the facts establish either first or second degree murder, but could not support a conviction of voluntary manslaughter and, accordingly, upon acquittal of murder and conviction of voluntary manslaughter, a reversal and discharge of the accused is required. However, this is not such a case. Under the rule announced in State v. Kidd, supra, it was proper for the court to submit the voluntary manslaughter issue.

That under the facts as set forth above, an instruction on voluntary manslaughter was proper and necessary would also seem to follow from our holding in State v. Ulibarri, 67 N.M. 336, 355 P.2d 275 (1960).

Appellant argues that the rule oft-repeated by us and restated in State v. Mosley, 75 N.M. 348, 404 P.2d 304 (1965), to the effect that when a statement of the accused which contains exculpatory matter is offered by the state, the excuse or justification contained therein must be overcome, and that if this is not done a conviction cannot stand. It is his position that when he admitted shooting deceased but added, "He was trying to beat me up," it became necessary that the State prove this statement untrue. Appellant has misconstrued the rule. Nothing more is required than that proof be submitted concerning the occurrence which, if true, or believed by the jury, would

support a conclusion that the statement was not true, or, even if true, that the facts did not require acquittal. Compare State v. Montoya, 78 N.M. 294, 430 P.2d 865 (1967). In the instant case there is proof that decedent had no intention to harm or beat up appellant when he approached appellant's car and opened the door. He was unarmed and his companions testified he did not appear "mad." Neither does it appear that anything was said. Compare State v. Ortega, 77 N.M. 7, 419 P.2d 219 (1966). In addition, we would point to the fact that although such a statement might lend support to a plea of self-defense, it does not take into account the amount of force threatened and imminent, or appellant's reaction thereto as a reasonable man and necessary to establish the defense. It is not every threatened beating that will justify a shooting in self-defense but, to the contrary, voluntary manslaughter might thereby be established. This is clearly evident from what is said in the quotation from State v. Wright, quoted supra. See also State v. Chesher, 22 N.M. 319, 161 P. 1108 (1916).

Appellant also argues, although not as a separate point, that the statement made to the police in the hospital was not admissible because in the nature of a confession and no warning had been given, or had he been advised of his rights to remain silent and to consult an attorney. He does not question that it was voluntarily made. It is his position that the rule announced by the Supreme Court of the United States in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R. 3d 974 (1966) and in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), is applicable and that error in receiving the evidence requires a reversal. We do not agree. It is quite evident here that appellant had neither been placed under arrest nor in any way detained when he volunteered the statement. Rather, it was made in answer to a question concerning what occurred and can be described as an answer to a general question of a person who knew something of what

transpired as a part of the fact-finding process, held not to be prohibited in Miranda v. State of Arizona, supra. We would also add that the statement was received in evidence without objection. Appellant will not now be heard to complain. See State v. Johnson, 57 N.M. 716, 263 P.2d 282 (1953).

What we have said above disposes of any argument to the effect that the State failed to prove each of the necessary elements required to constitute the offense of voluntary manslaughter, or that the jury did not give appellant the benefit of all reasonable doubt concerning his guilt.

No error being present the judgment and sentence are affirmed.

It is so ordered.

CHAVEZ, C. J., and COMPTON, J., concur.