478 P.2d 570

**STATE of New Mexico, Plaintiff-Appellee,**

**v.**

**Janice McLAM, Defendant-Appellant.**

**No. 520.**

Court of Appeals of New Mexico.

Dec. 18, 1970.

H. Gregg Privette, Privette & Privette, Las Cruces, for appellant.

James A. Maloney, Atty. Gen., Richard J. Smith, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

HENDLEY, Judge.

Defendant appeals her conviction of voluntary manslaughter. Two points are relied on for reversal. They deal with an incriminating statement given to the police.

We affirm.

### MIRANDA WARNINGS.

 Decedent was found slumped in the front seat of his wrecked car. The only

noticeable injury was a gash on his forehead. Investigating officers attributed death to the auto accident. An autopsy determined that he had been shot. The police, in searching decedent's personal effects, found a card in his billfold with the defendant's name and directions to her house. Based upon this information the chief of police called the defendant and asked if he could come and talk to her about a case he was investigating. She consented. Chief Silva, Sergeant Gonzales, and Mr. Perry, the Assistant District Attorney, went to interview the defendant. When they arrived they found the defendant and her son in the reception area of the law offices in which she worked. Sergeant Gonzales took defendant's son out of the office during the investigation leaving the defendant with Chief Silva and Mr. Perry. The defendant offered the investigators some coffee or orange juice. The defendant was seated behind her desk during the interview in her usual manner. Chief Silva, in plain clothes as was Mr. Perry, sat across the desk from defendant. Mr. Perry was present during the interview but asked few questions. Before the interview started Chief Silva advised the defendant that she did not have to talk to them and she replied that she would like to talk to them. During the hour long interview, defendant disclosed that she knew decedent and had been with him shortly before he was found by the police. After this disclosure she became a suspect and was immediately given her "Miranda warnings." After the warnings she continued to disclose the circumstances surrounding the death of the decedent. At trial Chief Silva recounted the following conversation with defendant:

"She said that she had left with him, that Stempler [the decedent] had not left by himself, that they had left together around 11:30 p. m. And they had driven on the road to El Paso and that she had told him that she didn't want to go to El Paso.

"That then he turned around and from the highway to El Paso on back to town that they had stopped at just about every motel and he insisted on going inside and she didn't want to go inside. And they stopped at a few motels and then she was —she told him that she wanted to go home, that she didn't want to go to any motel. Then he kept insisting, so she pulled a gun out and fired one round in front of him, into the floorboard of the vehicle. That at that time he pulled over and stopped the car and she opened the door to get out.

"At this time she said that Stempler turned around to grab her and she saw his face right in front of her and she fired and shot him in the forehead and then she had heard—the car took off. She had not seen the accident, that she heard the car crash. Then she said she walked home."

Defendant claims that from the above facts she was in the process of custodial interrogation and entitled to her "Miranda warnings" prior to the time they were given. We disagree. Reviewing the evidence in the light most favorable to admissibility we do not see sufficient facts to require us to hold as a matter of law that defendant was in custody and deprived of her freedom in any significant way prior to the time she was given her Miranda warnings. See State v. Sneed, 76 N.M. 349, 414 P.2d 858 (1966) and State v. Chacon, 80 N.M. 799, 461 P.2d 932 (Ct.App.1969). She was in the familiar surroundings of her own office, she was told she did not have to say anything, and of her own free will decided to talk to the police. Chief Silva testified that she was talkative, cooperative, and very much at ease; she was not nervous, tense, or apprehensive. She was told three times by Mr. Perry that she could call her attorney-employer and she was only two or three feet from the telephone on her desk during the interview. Miranda v. Arizona, 384 U.S. 436, 87 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is concerned with the circumstances of an interrogation that may have a coercive effect upon the responses elicited. We find nothing in the record that requires a holding, as a matter

of law, that the atmosphere of the interview and interrogation was coercive at any time.

## EXCULPATORY OR INCULPATORY STATEMENT.

■ The defendant next contends that her statement included exculpatory matter which the State failed to overcome in its case in chief. The general rule is that if the state offers a statement of the accused containing exculpatory matter, it must overcome the defendant's claim of excuse or justification. State v. Mosley, 75 N.M. 348, 404 P.2d 304 (1965). As we interpret the statement, it merely states that decedent insisted that defendant go to a motel with him; that in response to this insistence defendant fired a warning shot; that decedent then turned to grab the defendant; and defendant shot and killed the decedent.

■ We agree that the defendant, as others similarly situated, may use reasonable force in defense of one's self. But as stated in State v. Lopez, 79 N.M. 282, 442 P.2d 594 (1968), "It is not every threatened beating that will justify a shooting in self-defense but, to the contrary, a voluntary manslaughter might thereby be established." The force threatened and imminent, and defendant's reaction thereto, must be taken into consideration. State v. Beal, 55 N.M. 382, 234 P.2d 331 (1951); State v. Simpson, 39 N.M. 271, 46 P.2d 49 (1935); and State v. Parks, 25 N.M. 395, 183 P. 433 (1919). The facts surrounding defendant's choice of deadly force when confronted with a possible battery would sustain a conviction of voluntary manslaughter. We therefore hold that under the fact situation the statement was *inculpatory* of voluntary manslaughter although *exculpatory* of murder. Compare the fact situation of the present case with State v. Lopez, supra.

Affirmed.

It is so ordered.

SPIESS, C. J., and WOOD, J., concur.