901 P.2d 164

STATE of New Mexico,
Plaintiff–Appellee,

v.

Ricky ABEYTA, Defendant–Appellant.

No. 20488.

Supreme Court of New Mexico.

July 20, 1995.

Sammy J. Quintana, Chief Public Defender, David Henderson, Asst. Appellate Defender, Santa Fe, for appellant.

Tom Udall, Atty. Gen., Mary Catherine McCulloch, Sp. Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

BACA, Chief Justice.

Defendant–Appellant Ricky Abeyta appeals from seven homicide convictions. Defendant was convicted of first-degree murder, see NMSA 1978, § 30–2–1(A)(1) (Repl. Pamp.1984), in the deaths of Cheryl Rendon, Mary Ellen Sandoval, Ignacita Sandoval, and State Police Officer Glen Huber. Defendant was also convicted of second-degree murder, see § 30–2–1(B), in the deaths of Macario Gonzales and Rio Arriba County Deputy Sheriff Jerry Martinez, and involuntary manslaughter, see § 30–2–3(B), in the death of Justin Gonzales. The trial court sentenced Defendant to a total of 146 years imprisonment. On appeal, we address the following issues: (1) Whether the trial court erred in refusing Defendant's requested jury instructions on involuntary manslaughter in the deaths of Ignacita Sandoval, Jerry Martinez, and Glen Huber based on imperfect self-defense, (2) whether the trial court erred in refusing Defendant's requested jury instructions on voluntary manslaughter in the deaths of Macario Gonzales, Cheryl Rendon, and Mary Ellen Sandoval based on transferred-intent in self-defense and imperfect defense of habitation, (3) whether substantial evidence supported the first-degree murder conviction for the murder of Mary Ellen Sandoval, and (4) whether prosecutorial misconduct deprived Defendant of a fair trial. We find Defendant's other arguments to be without merit. We review this case pursuant to SCRA 1986, 12–102(A)(2) (Repl. Pamp.1992). We affirm as to each issue; therefore, we need not address whether cumulative error deprived Defendant of a fair trial.

## I

There are differing versions as to what occurred at Defendant's home in Chimayo on January 26, 1991. The following account is a necessarily incomplete recounting of the events surrounding the seven deaths that occurred that Saturday afternoon. Because of the large number of persons involved, we give a brief summary of their relationship to the Defendant or Ignacita Sandoval, his girlfriend, and their role in the events. We use first names to avoid confusion and give the approximate ages of the children when this event occurred. Defendant and Ignacita had lived together about two years. Ignacita's fourteen-year old son, Eloy; her nineteen-year old daughter, Mary Ellen; Mary Ellen's twenty-one year old boyfriend, Macario; their six-month old son, Justin; and Ignacita's sixteen-year old sister, Celina, had lived with Defendant and Ignacita at various times during this period. Ignacita decided to leave Defendant the previous Wednesday and these family members were helping her pack up her belongings. Ignacita's twenty-five year old sister, Cheryl, along with her two young children, Roland and Nicky, also helped with the move. In addition, Ignacita hired Peter Martinez, a neighbor whom she met that morning in Chimayo, to assist with the loading.

Defendant's mother, Mrs. Abeyta, lived next door with Defendant's two sisters, Dora and Sandra. Mrs. Abeyta and Dora were at the scene at various times during the day. Sandra joined the group after she got home from work Saturday afternoon. Sandra's boyfriend, Lawrence Taraddei, arrived about the same time.

Fearing Defendant would become violent, Ignacita had called for police protection while she moved. Rio Arriba County Deputy Sheriff Jerry Martinez supervised as Ignacita began packing, but he left shortly afterwards to investigate a tip on a stolen car. State Police Officer Glen Huber stopped by to assist Deputy Martinez as the packing began. After finding that everything was under control, Officer Huber left. Huber later returned when he heard about the shooting.

Following a quarrel with Defendant on the preceding Wednesday, Ignacita decided to move out of Defendant's home and filed for a restraining order against Defendant. Ignacita and Defendant had separated on three prior occasions, and each time Ignacita removed all her possessions. Defendant asserts that each time Ignacita removed most of his possessions as well. Defendant anticipated that Ignacita would once again remove his possessions with hers.

On Saturday morning, Defendant carefully locked his home and gate before leaving for work in Santa Fe. Deputy Martinez attempted to deliver Ignacita's restraining order that morning but declined to leave it with Defendant's mother, Mrs. Abeyta, stating that it was improperly prepared. Around noon, Ignacita and her family arrived at Defendant's house. Eloy cut the gate to the house with wirecutters. At that point Deputy Martinez arrived and gave the group permission to enter the house and retrieve Ignacita's possessions. Mrs. Abeyta and Dora met Ignacita at the gate to keep her from taking Defendant's property. Deputy Martinez again presented the restraining order to Defendant's family, assuring them that it was now valid. Ignacita and her family proceeded to pack up her possessions while Mrs. Abeyta and Dora waited outside.

The State's evidence tended to show that Eloy and Macario were outside the home loading the U–Haul truck. Mrs. Abeyta and Dora watched the loading and at one point Dora retrieved Defendant's quilt that had been dropped on the ground by the porch. Shortly afterwards Defendant rapidly approached the home carrying a rifle and a revolver and engaged in an altercation with Eloy. Following that encounter, Defendant shot Eloy, wounding him in the shoulder. Defendant then shot Macario in the back with his rifle as Macario stood inside the rear compartment of the U–Haul. Upon hearing the shots, Mary Ellen grabbed her six-month-old son, Justin, and ran outside. Both mother and child were shot in the head and killed as they fled. The State's evidence is unclear whether mother and child were killed by the same or different bullets.

According to the State's evidence, Defendant then entered his home where Ignacita, Cheryl, and Celina were packing. He yelled that they would pay and then shot Cheryl in the back of the head as she knelt on the kitchen floor. Defendant shot Ignacita twice, first hitting her finger, then fatally shooting her in the face. Defendant may also have hit Ignacita twice on the back of the head, possibly with the gun.

The State's evidence indicates that as Defendant left the house, he shot Eloy a second time, wounding him in the groin. Defendant encountered Deputy Martinez who had just returned and shot him in the head twice at close range while Martinez stood next to his police car. A short time later Officer Huber arrived at the scene. Defendant had already reached his mother's house up the hill. He shot Huber in the head as the officer stood with one foot in the patrol car and the radio still in his hand. Defendant then fled to the hills behind his mother's house. He turned himself in late the next day in Albuquerque.

Defendant's testimony as to the events surrounding the killings differs significantly from the State's evidence. The Defendant testified that he returned in the late afternoon from working in Santa Fe. He came home on the back road and parked at his mother's house so he did not notice the vehicles parked at his house. He then took the paint he had purchased earlier that day down the hill to his garage. Upon seeing the moving operation, Defendant testified that he decided to take his rifle and revolver out of the garage and take them up to his mother's house out of concern that Ignacita would also pack up everything from his garage.[1] He placed the revolver in the back of his waistband and picked up the rifle by the sling. As he started back up to his mother's, he noticed that some of his clothes were being taken to the U–Haul. He went over to the house to ask them to leave his stuff. Defendant testified that as he reached the bottom of the steps, Eloy accosted him with a knife and

---

**1.** Defendant had taken his weapons out to the garage for safe-keeping after Ignacita left following the quarrel on Wednesday night.

during the scuffle cut his left hand twice. Defendant forced Eloy to drop the knife. Macario was in the back of the U–Haul where Defendant saw some of his possessions. When Defendant asked Macario what was going on, he testified Macario responded that he didn't know, but "don't try and stop us 'cause you won't see tomorrow." Defendant then saw Eloy pointing a handgun at him from the cab of the U–Haul. Defendant testified that he reacted automatically by lunging to the side and shooting, not knowing whether he had wounded Eloy. Defendant placed another round in the chamber of his rifle and put it on the porch railing. Defendant was struck on the head from behind and fell. His rifle slipped off the railing. As he grabbed at it, it discharged.[2] He continued to recover the rifle and unintentionally caused a third round to be injected into the chamber. He testified that he felt someone grab his revolver from the back of his waistband. As he turned around to see who had hit him, he caught a glimpse of someone walking by with a baby. Defendant testified that he was hit on the head again, and again the rifle discharged after falling out of his hands.[3] It landed at the bottom of the steps, where Defendant left it.

According to Defendant, he then went inside the house to find out who had hit him. He encountered Cheryl in the kitchen and, sensing trouble, grabbed her and spun her around in front of him. She screamed, "No, Rick, no Rick, stop." Ignacita had his revolver. Cheryl screamed, "No, Ignacita," covered her face, and started to bend over. Defendant went down with Cheryl. Defendant testified that Ignacita fired the revolver at him but hit Cheryl instead. Defendant and Ignacita struggled over the gun. Defendant testified that Ignacita again fired the revolver but her hand was in the way and the shot nearly severed the tip of her left little finger. He next saw Ignacita heading for the front door with the gun in her hand. Defendant testified that as he caught her, Ignacita

bent down, trying to escape. She pointed the gun at Defendant who hit the barrel forcing it back towards her. The gun discharged, shooting Ignacita in the face. Defendant appeals his convictions based on the trial court's refusal to give his requested jury instructions, the lack of substantial evidence in Mary Ellen's death, and prosecutorial misconduct.

## II

We first address Defendant's argument that the trial court erred in failing to instruct the jury on involuntary manslaughter based on imperfect self-defense in the deaths of Ignacita, Deputy Martinez, and Officer Huber. The jury received instructions on first- and second-degree murder, voluntary manslaughter, provocation, and self-defense as to each death.

■ It is well established that where the evidence supports a party's theory of the case, that party is entitled to submit proper instructions regarding that theory to the jury. *See State v. Chamberlain,* 112 N.M. 723, 728, 819 P.2d 673, 678 (1991). Therefore, we must determine whether there was sufficient evidence to support Defendant's theory of involuntary manslaughter based on imperfect self-defense.

■ Self-defense is a justification to all homicides and results in acquittal rather than mitigation. The requirements of self-defense are (1) an appearance of immediate danger of death or great bodily harm to the defendant, (2) the defendant was in fact put in fear by the apparent danger, and (3) a reasonable person in the same circumstances would have reacted similarly. *See* SCRA 1986, 14–5171; *State v. Martinez,* 95 N.M. 421, 423, 622 P.2d 1041, 1043 (1981). In addition, the claim of self-defense may fail if the defendant was the aggressor or instigator of the conflict, *see* SCRA 1986, 14–5191; *State v. Chavez,* 99 N.M. 609, 611, 661 P.2d 887, 889 (1983), or if the Defendant uses excessive force in re-

2. Defendant claimed he was unaware anyone had been killed but he acknowledged that this "accidental" discharge may have resulted in Macario's death.

3. Again, Defendant claimed he was unaware anyone was killed when his rifle discharged, but he initially thought that this discharge killed Mary Ellen and Justin. Defendant also speculated that Ignacita may have killed Mary Ellen and Justin while attempting to shoot him.

sponse to the threat, *see State v. McLam,* 82 N.M. 242, 244, 478 P.2d 570, 572 (Ct.App. 1970). In some jurisdictions, the defendant who misjudges the need for self-defense may be convicted under the lesser-included charge of manslaughter rather than murder. *See* Laurie J. Taylor, Comment, *Provoked Reason in Men and Women: Heat–of–Passion Manslaughter and Imperfect Self–Defense,* 33 UCLA L.Rev. 1679, 1707 (1986).

The State argues that New Mexico does not recognize the theory of imperfect self-defense. Although New Mexico appellate courts have only recently used that phrase in *State v. Arias,* 115 N.M. 93, 94, 847 P.2d 327, 328 (Ct.App.1993), New Mexico has long recognized that "heat of passion" includes fear for one's own safety that may result in an unreasonable belief in the need to defend oneself.

In *State v. Kidd,* 24 N.M. 572, 579–80, 175 P. 772, 774 (1917), we held that although the killing was not justified as self-defense, there was sufficient provocation of fear to mitigate murder to voluntary manslaughter. The evidence indicated that Defendant had engaged in an illicit relationship with the victim's wife. The jury apparently rejected the Defendant's claim of self-defense because he initiated the fatal confrontation by going to the victim's property. This Court, however, upheld the verdict of voluntary manslaughter, finding that there was sufficient evidence presented that when the Defendant killed the victim, he was acting under provocation of fear for his life. *Id.*

 Where a defendant presents sufficient evidence to support a theory of self-defense, it raises a question of fact for the jury to resolve. If the jury believes the argument, the defendant is acquitted. *See* Leo M. Romero, *Sufficiency of Provocation for Voluntary Manslaughter in New Mexico: Problems in Theory and Practice,* 12 N.M.L.Rev. 747, 766–67 (1982). If the jury rejects the theory of self-defense, it may still find the defendant acted under provocation of fear and may mitigate the charge of murder to the lesser charge of voluntary man-

slaughter. *Id.* We agree that "[v]oluntary manslaughter does not require that the defendant's act of killing be reasonable." *Id.* at 767. We also agree that the "critical difference between self-defense and voluntary manslaughter lies not in provocation or the emotion of fear, but rather in the reasonableness of the defendant's conduct in killing." *Id.* at 770. This is supported by our decision in *State v. Melendez,* 97 N.M. 738, 740, 643 P.2d 607, 609 (1982) (quoting *Kidd,* 24 N.M. at 579, 175 P. at 774) (citations omitted), in which we noted:

> Self-defense is a belief by a *reasonable man* in the necessity to save himself from death or great bodily harm. Provocation supporting a conviction for voluntary manslaughter, on the other hand, is an act "committed under the influence of an *uncontrollable fear of death* or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense."

It is not unreasonable that the accused should be found guilty of voluntary manslaughter where the plea of self-defense fails. *State v. Lopez,* 79 N.M. 282, 285, 442 P.2d 594, 597 (1968). Although the unreasonable belief in the need for self-defense may well be termed imperfect self-defense,[4] this label is somewhat misleading. Such conduct is not a true defense and does not justify the killing. Rather, the claim of imperfect self-defense simply presents an issue of mitigating circumstances that may reduce murder to manslaughter.

 The State argues that in some circumstances we have held that giving instructions on both self-defense and manslaughter is inappropriate and that "there is no rule in New Mexico that voluntary manslaughter is a lesser included defense of self-defense." However, the State relies on cases that either found insufficient evidence to sustain the initial claim of self-defense or did not address self-defense. Thus, we follow our prior rulings in *Melendez, Lopez,* and *Kidd.*

4. Since 1917 this "imperfect" self-defense has been adequately covered under our jury instructions on manslaughter. We see no reason to

change our jury instructions to accommodate a new phrase covering a legal concept that has long been a part of New Mexico law.

 The State points out the potential for conflict where instructions on both self-defense and provocation are given to the jury. We concur in the remedy suggested in *State v. Parish,* 118 N.M. 39, 878 P.2d 988 (1994), that a jury should be "told that it was *required* to find Defendant not guilty if his conduct met the definition of self-defense." *Id.* at 47, 878 P.2d at 996. To do otherwise would present conflicting instructions where a jury would first examine the evidence to evaluate whether there was adequate provocation to support mitigating murder to manslaughter and then would review the same evidence to determine if the killing was justified or excused on the basis of self-defense. *Id.* at 46, 878 P.2d at 995.

 We agree with Defendant that whenever the evidence is sufficient to raise a question of self-defense, an instruction on voluntary manslaughter should also be submitted to the jury where the evidence supports sufficient provocation of fear for one's own safety. We take exception, however, with Defendant's argument that such a situation also requires an instruction on involuntary manslaughter. Under our statutory construction of voluntary manslaughter, sufficient provocation arising from fear for one's own safety only mitigates murder to voluntary manslaughter, not involuntary manslaughter. *See* § 30–2–3.

Defendant argues that the statutory definition of involuntary manslaughter also includes the concept of imperfect self-defense and points to *State v. Arias,* 115 N.M. 93, 847 P.2d 327 (Ct.App.1993), for support. In *Arias,* the defendant, fearing for his safety, fired twice at several people who were armed with boards and unintentionally killed a third person. *Id.* at 94–95, 847 P.2d at 326–27. The Court of Appeals held that the trial court had a duty to instruct the jury on involuntary manslaughter based on imperfect self-defense. *Id.* at 97, 847 P.2d at 329. In reaching this conclusion, the Court focused on the second prong of the involuntary manslaughter statute which provides that involuntary manslaughter is a manslaughter that results from the "commission of a lawful act which might produce death in an unlawful manner or without due caution or circumspection."

Section 30–2–3(B). The Court held that because the defendant claimed to have shot at the victim in self-defense, without intending to kill the victim, the shooting "could be viewed as being the commission of a lawful act [self-defense] committed in an unlawful manner or without due caution or circumspection." *Arias,* 115 N.M. at 97, 847 P.2d at 329. The Court based its analysis on two California cases, *People v. Glenn,* 229 Cal. App.3d 1461, 280 Cal.Rptr. 609, 612 (1991), and *People v. Welch,* 137 Cal.App.3d 834, 187 Cal.Rptr. 511, 514 (1982), which held that imperfect self-defense gives rise to a claim of involuntary manslaughter where the defendant did not intend to kill the victim.

However, the holding in *Arias* ignored established New Mexico precedent regarding involuntary manslaughter and imperfect self-defense. We previously addressed this issue in *State v. Pruett,* 27 N.M. 576, 203 P. 840 (1921). In *Pruett,* the defendant alleged self-defense in killing a man he encountered while out hunting. The jury convicted the defendant of involuntary manslaughter. This Court reversed the conviction, noting:

> The act of killing the deceased by intentionally shooting him with a rifle could not be said to be a killing "in the commission of an unlawful act not amounting to a felony," under the first clause of the [involuntary manslaughter] statute, [because], if the act was not justified by the law of self-defense, it would constitute at least an assault with a deadly weapon and would be a felony under [the relevant statute]. Under the same conditions the same act would not fall within the terms of the second clause of the [involuntary manslaughter] statute, because the act of appellant, unless justified by the circumstances, would not be lawful.

*Id.* at 578, 203 P. at 841.

 Self-defense is only a justification for a killing, and thus a lawful act, if all the elements necessary for self-defense are met. One requirement of self-defense is that the force used must be reasonable in relation to the threat. *State v. McLam,* 82 N.M. 242, 244, 478 P.2d 570, 572 (Ct.App.1970). The use of excessive force in self-defense renders the entire action unlawful. Therefore the

action cannot be deemed a lawful act done in an unlawful manner under the involuntary manslaughter statute. *See People v. Heflin*, 434 Mich. 482, 456 N.W.2d 10, 21–22 (1990) (holding that imperfect self-defense is unlawful by definition and therefore cannot fall within the category of involuntary manslaughter). In addition, as noted above, *shooting at* someone with a rifle, if not justified as perfect self-defense, would be a felony assault and would not fall under the misdemeanor-manslaughter prong of the involuntary manslaughter statute. *See* NMSA 1978, § 30–3–2 (Repl.Pamp.1994) (aggravated assault). *Actually shooting* someone without excuse or justification would, of course, constitute at least aggravated battery. *See* § 30–3–5.

Finally, to the extent that *Arias* adopted the rationale of the California cases, which distinguished between voluntary and involuntary manslaughter based on the existence of an intent to kill, it is contrary to clear precedent defining the necessary mens rea for voluntary manslaughter. In finding that a defendant must intend not just the harm that caused the death but must also intend the victim's death in order to find voluntary manslaughter, *Arias* defined voluntary manslaughter as a specific-intent crime. However, in *State v. Beach*, 102 N.M. 642, 645, 699 P.2d 115, 118 (1985), we held that voluntary manslaughter was a general-intent crime by statutory definition.[5] The mens rea required for voluntary manslaughter is that a defendant intended to cause the harmful act. This requirement will almost always be satisfied where a defendant uses a firearm in imperfect self-defense. *See Crawford v. State*, 245 Ga. 89, 263 S.E.2d 131, 135 (1980) ("[T]he deadly force of a gun is known to all.").

Thus, where a defendant shoots someone in imperfect self-defense, the charge of murder can only be mitigated to voluntary manslaughter and an instruction on involuntary manslaughter is inappropriate. *See State v. Martin*, 52 N.C.App. 373, 278 S.E.2d 305, 307 (intentionally discharging a gun in imperfect self-defense under circum-

stances naturally dangerous to human life cannot be involuntary manslaughter), *review denied*, 303 N.C. 549, 281 S.E.2d 399 (1981); *Heflin*, 456 N.W.2d at 21 (noting that imperfect self-defense does not require an instruction on involuntary manslaughter); *Lamon v. State*, 260 Ga. 119, 390 S.E.2d 582, 583 (1990) ("The law is well settled in this state that a charge on involuntary manslaughter is not required where the defendant asserts using a gun in self-defense."). Accordingly, to the extent that it is inconsistent with this opinion and established precedent, *Arias* is overruled.

In the present case, we may quickly dispose of Defendant's argument for involuntary manslaughter instructions in the deaths of Deputy Martinez and Officer Huber. Defendant does not argue that the shootings were accidental. The evidence presented indicates that Defendant aimed at and shot both men. Defendant's only argument is that he was acting in imperfect self-defense. Accordingly, in light of our discussion above, the court did not err in denying Defendant's requested instructions.

Defendant's argument for an involuntary manslaughter instruction with respect to the death of Ignacita, however, is on a slightly different footing. While a claim of imperfect self-defense does not give rise to the need for an involuntary manslaughter instruction, a claim of accidental shooting might. *Lopez*, 79 N.M. at 285, 442 P.2d at 597. Furthermore, it is possible for an accidental shooting to occur in the process of imperfect self-defense. *See United States v. Browner*, 889 F.2d 549, 555 (5th Cir.1989) (noting that involuntary manslaughter instruction was appropriate where evidence indicated that stabbing was accidental even though defendant's alternate claim of imperfect self-defense would only merit voluntary manslaughter instruction).

However, the facts in this case do not present any evidence to support instructions on involuntary manslaughter. Defendant testified that Ignacita was pointing the

---

**5.** We note that *Beach* incorrectly classifies second-degree murder as a general-intent crime.

However, that is not relevant to the issues before us.

gun at him and had already fired two shots in his direction. He claimed that he grabbed Ignacita and she pointed the gun at him a third time. He reacted by hitting the barrel of the gun to direct it away from his body. According to Defendant, the blow directed the barrel back toward Ignacita, at which point Ignacita's finger depressed the trigger. Under these facts, Defendant would not be guilty of any crime. The only person who could possibly be chargeable with involuntary manslaughter would be Ignacita, who either accidentally or intentionally discharged the gun. At first blush this may be difficult to envision since Ignacita was also the person killed. However, it becomes clearer if we consider the shot to have killed a third party. Defendant would not be responsible for the resulting death because it was Ignacita's accidental or intentional firing of the gun that led to that death. Accordingly, it would have been error to present the jury with an involuntary manslaughter instruction based on an accidental killing. Under the conflicting evidence presented by the State and Defendant, the jury could have found either that Ignacita pulled the trigger and that Defendant should therefore be acquitted of her killing, or that Defendant had control of the gun and killed Ignacita while intending to cause harm to her. The jury rejected Defendant's theory and convicted him of first-degree murder. We find no error in the trial court's refusal of Defendant's requested instructions.

### III

We next consider whether the trial court erred in refusing Defendant's requested jury instructions on voluntary manslaughter in the deaths of Macario Gonzales, Cheryl Rendon, and Mary Ellen Sandoval. Defendant argues Macario was a bystander killed while he defended himself against Eloy. Defendant also argues that Cheryl and Mary Ellen were killed while he was defending his property. Jury instructions were submitted for first- and second-degree murder and involuntary manslaughter as to all three deaths. The jury returned a second-degree verdict in Macario's death and first-degree verdicts in Cheryl's and Mary Ellen's deaths.

The court gave self-defense instructions and Defendant was acquitted of two counts of attempted murder against Eloy. Defendant first argues that the need for self-defense against Eloy transferred to Macario because they were both working together. Alternatively, Defendant urges this Court to accept Macario's verbal threat as constituting adequate provocation. We decline to hold that Macario's threat alone was sufficient provocation and find the doctrine of transferred-intent based on self-defense is not sufficiently supported by the evidence to justify instructions on self-defense and voluntary manslaughter in Macario's death.

We have long recognized the doctrine of transferred-intent concerning an intentional killing in which the wrong victim is killed. *State v. Carpio,* 27 N.M. 265, 272, 199 P. 1012, 1013 (1921); *accord State v. Hamilton,* 89 N.M. 746, 750, 557 P.2d 1095, 1099 (1976). Transferred-intent also applies to attempted murder. *State v. Gillette,* 102 N.M. 695, 705, 699 P.2d 626, 636 (Ct.App.1985). In addition, where an innocent bystander is accidentally killed during the attempt to defend oneself, the doctrine of self-defense provides a defense against the unintended killing. *State v. Sherwood,* 39 N.M. 518, 520, 50 P.2d 968, 969 (1935). However, the Court of Appeals has acknowledged that one may not transfer "one's passion from the object of the passion to a related bystander." *State v. Gutierrez,* 88 N.M. 448, 451, 541 P.2d 628, 631 (Ct.App.1975) (finding evidence of provocation between defendant and his wife did not transfer to mitigate defendant's attack on child).

In the case at bar, Defendant argues that Macario was killed as a bystander while he was defending himself against Eloy. Defendant testified that he fired twice at Eloy. He fired the first shot when he saw Eloy pointing a gun at him from the cab of the U–Haul. He fired the second shot upon leaving the house after Ignacita had killed herself and long after Macario had been killed. Eloy testified that Defendant shot him twice before Defendant entered the house. It is uncontroverted that Eloy was hit twice by Defendant. There is no evidence to support the theory that a bullet intended for Eloy

went astray and struck Macario. Accordingly, Defendant killed Macario either accidentally, when the gun discharged, or intentionally. However, the doctrine of transferred-intent is not applicable under either circumstance. We therefore find no error in the court's refusal to give self-defense or voluntary manslaughter instructions based on transferred-intent in Macario's death.

As to Defendant's second argument, we have long held that words alone are insufficient to arouse ungovernable passion in a killer. *Sells v. State*, 98 N.M. 786, 787–88, 653 P.2d 162, 163–64 (1982). Defendant urges us to find that "informational words" may constitute adequate provocation. We recognize that informational words, combined with "ensuing arguments and other actions of the parties, when taken together, could amount to provocation." *Id.* at 788, 653 P.2d at 164. "Each case must be read and interpreted in the light of the facts in that particular case." *Id.* In order to sustain jury instructions on voluntary manslaughter, the evidence must show adequate provocation. Defendant argues that Macario's threat told him he was in danger. However, Defendant presents no evidence that an argument or other threatening conduct ensued. Although Macario verbally threatened Defendant, he took no steps to carry out his threat, nor did he have the means to do so. We have previously stated that " '[m]ere· sudden anger or heat of passion will not reduce the killing from murder to manslaughter. *There must be adequate provocation.* The one without the other will not suffice to effect the reduction in the grade of the offense.' " *State v. Nevares*, 36 N.M. 41, 44, 7 P.2d 933, 935 (1932); *accord State v. Robinson*, 94 N.M. 693, 701, 616 P.2d 406, 414 (1980). Accordingly, we find no error in the court's denial of Defendant's requested jury instructions on voluntary manslaughter in Macario's death.

Finally, Defendant argues that he shot Mary Ellen and Cheryl in an "imperfect defense of habitation" and he should have been permitted to tender voluntary manslaughter in these deaths. We have long recognized the defense of defense of habitation. *See State v. Couch*, 52 N.M. 127, 137, 193 P.2d 405, 411 (1948). However, we re-

quire that the defense of habitation be reasonable and that the defendant believes his safety is threatened. *See Brown v. Martinez*, 68 N.M. 271, 280, 361 P.2d 152, 159 (1961). In *Brown*, the Court noted that because "*the law has always placed a higher value upon human safety than upon mere rights in property, it is the accepted rule that there is no privilege to use any force calculated to cause death or serious bodily injury where only the property is threatened.*" *Id.* (quoting William L. Prosser, *Handbook of the Law of Torts* § 21, at 93 (2d ed. 1955)). Although we agree that the use of more force than necessary in defense of habitation alone is not justified, *id.*, we recognize that where the evidence supports a finding that the trespasser aroused sufficient provocation, manslaughter instructions are appropriate. *Couch*, 52 N.M. at 137, 193 P.2d at 411.

In the present case Ignacita was lawfully removing her possessions with her family's help. We recognize that Defendant did not know Ignacita had obtained a restraining order or had gained access to the property under the authority of the Deputy Sheriff. However, Defendant did know that Ignacita had the right to remove her own property. Defendant alleges sufficient provocation based on his testimony that Ignacita shot at him and this provocation should transfer to all who were helping her. However, the alleged shooting would have only given rise to a claim of self-defense, not defense of habitation. It is undisputed that Ignacita was not a trespasser and that she did not enter the house in order to commit a felony involving violence. Ignacita was in fact unarmed when she entered the house. Furthermore, the shots Ignacita allegedly fired were not intended to damage Defendant's property but instead to injure Defendant's person. Ignacita's actions clearly would not implicate the doctrine of defense of habitation and were properly analyzed under the doctrine of self-defense.

As we noted earlier, although Ignacita's actions may have amounted to sufficient provocation to warrant an instruction of manslaughter in her death, this provocation cannot be transferred to a related bystander.

*Gutierrez,* 88 N.M. at 451, 541 P.2d at 631. Defendant presents no evidence that Mary Ellen or Cheryl posed a threat to him or were trespassers damaging his personal property. After hearing shots Mary Ellen attempted to flee. The only evidence regarding Cheryl is that she passively submitted. Defendant presents no evidence to support a finding of provocation by Cheryl or Mary Ellen and, as we stated above, Defendant's mere anger is insufficient to constitute provocation. We find no error in the court's denial of Defendant's requested instructions on voluntary manslaughter based on imperfect defense of habitation in Cheryl's and Mary Ellen's deaths.

## IV

We next consider whether substantial evidence supports Defendant's conviction in the murder of Mary Ellen. Defendant argues that he didn't even know Mary Ellen was in the house and that the "jury would have engaged in sheer speculation had it concluded without additional evidence that Mr. Abeyta had decided to harm Mary Ellen in particular simply because she was Ignacita's daughter."

We require that evidence point logically to a defendant to assure that the basis of a conviction is not mere speculation. *State v. Malouff,* 81 N.M. 619, 621, 471 P.2d 189, 191 (Ct.App.1970). This does not mean that we may reweigh the evidence to determine the comparative credibility of Defendant's theory. Nor may we substitute our judgment for that of the jury. *State v. Lankford,* 92 N.M. 1, 2, 582 P.2d 378, 379 (1978). Only the jury may resolve factual discrepancies arising from conflicting evidence. *Id.* On appeal, we review "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We view the evidence in the light most favorable to supporting the verdict and resolve all conflicts and indulge all permissible inferences in favor of upholding the verdict. *Id.*

The jury received first-degree murder instructions under both Sections 30–2–1(A)(1), deliberate intent, and 30–2–1(A)(3), depraved-mind murder. Due process requires that each element of the crime charged must be supported by evidence beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Reese v. State,* 106 N.M. 498, 501, 745 P.2d 1146, 1149 (1987). We find the evidence sufficient to support finding either deliberate intent or depraved mind. Deliberate intent may be formed in a very short period of time. *See* SCRA 14–201(3). However, we will not find deliberate intent where a killing is the result of "[a] mere unconsidered and rash impulse, even though it includes an intent to kill." *Id.* To find the evidence sufficient to support a conviction for depraved-mind murder we require that the conduct endanger more than one person. *See State v. Hernandez,* 117 N.M. 497, 499, 873 P.2d 243, 245 (1994) (discharging defendant based on finding fatal shot occurred during struggle and not from prior shots fired at two or more persons that could have constituted depraved-mind murder); *State v. Haynie,* 116 N.M. 746, 748, 867 P.2d 416, 418 (1994) (reversing first-degree conviction and remanding for judgment on lesser included second-degree conviction based on evidence that each murder was separate and distinct). In addition, we noted in *State v. McCrary,* 100 N.M. 671, 673, 675 P.2d 120, 122 (1984), that although one element of depraved-mind murder is that the defendant have subjective knowledge, that does not mean that the defendant must know of the victim's presence. In *McCrary,* we held that, "sufficient subjective knowledge exists if Defendants' conduct was very risky, and under the circumstances *known to Defendants* they should have realized this very high degree of risk." *Id.*

No one witnessed Mary Ellen's death. Circumstantial evidence indicates that Defendant and Eloy were the only people outside the house who could have had a weapon when Mary Ellen was killed. Defendant alleges Eloy fired at him, but the gun was never presented into evidence nor were any casings from the shots Eloy allegedly fired at Defendant ever found. All the cas-

ings found matched either the Defendant's or the police officers' guns.

Eloy testified that as he and Macario started to get out of the truck, they saw Defendant walking quickly towards the house carrying a revolver and a rifle. Eloy testified that Defendant then opened fire on them. Celina testified that she heard Mary Ellen scream, saw her grab her infant son, Justin, and run out of the house. Both Mary Ellen and Justin were shot in the head as they fled. Although the evidence is not conclusive as to what weapon killed Justin, he probably died from the same weapon that killed his mother.

At the time of the shooting, there were at least five people outside the house besides Defendant: Eloy, Macario, Mary Ellen, Justin, and Dora, Defendant's sister. Defendant admitted that he was aware that Ignacita was inside the house, and he had noted that there were several cars and trucks parked in front of his home, indicating that other family members were also inside.

Defendant contends that his revolver had been taken from him when he was struck from behind. He testified that if he killed Mary Ellen, it could only have been when his rifle accidentally discharged. Defendant also stated that after receiving the medical reports he was relieved to learn that Mary Ellen and Justin were killed with the .357 rather than the rifle and they "didn't die in my hands." Defendant claims that Ignacita shot Mary Ellen and Cheryl while trying to kill him. However, the jury heard the testimony of all the witnesses and determined what credibility to give it. *Lankford,* 92 N.M. at 2, 582 P.2d at 379. Viewing the evidence in the light most favorable to the verdict, *id.,* we find that the evidence that Defendant repeatedly fired his gun under circumstances where Defendant knew multiple people were present who could be harmed is sufficient to support the conviction based on depraved-mind murder. We also find the evidence sufficient to support a conviction for deliberate-intent murder. The jury could have found that Defendant formed a deliberate intent to kill Ignacita and everyone assisting her in removing her possessions. The jury could have rejected Defendant's assertions based on the fact that Mary

Ellen was killed instantly with a single shot to the head. The jury saw the witnesses, heard the testimony, and determined what credibility to give it. Deliberate intent may be "inferred from all the facts and circumstances of the killing." SCRA 14–201. We will not reweigh the evidence.

## V

Finally, we address whether prosecutorial misconduct deprived Defendant of a fair trial. Defendant objects to two statements in particular made by the prosecutor during closing argument. Defendant urges this Court to find that the prosecutor improperly attacked the integrity of Defendant's counsel. Defendant further urges that we find the prosecutor's statement that Defendant "forced Cheryl to get down on her knees and beg for her life before he shot her" constituted reversible error because it exceeded the bounds of proper argument. We decline to do so in either case.

 We review Defendant's claim of prosecutorial misconduct under the standard of abuse of discretion. *State v. Jett,* 111 N.M. 309, 314, 805 P.2d 78, 83 (1991). Prosecutors may comment on the veracity of a witness "as long as a personal opinion is not expressed and as long as the comments are not intended to incite the passion of the jury." *Aguilar,* 117 N.M. 501, 507, 873 P.2d 247, 253 (quoting *State v. Stith,* 71 Wash. App. 14, 856 P.2d 415, 419 (1993)), *cert. denied,* —— U.S. ——, 115 S.Ct. 182, 130 L.Ed.2d 116, *and cert. denied,* —— U.S. ——, 115 S.Ct. 168, 130 L.Ed.2d 105 (1994). Where the evidence presents two conflicting versions of the same events, "a party may reasonably infer, and thus argue, that the other side is lying." *Id.* The prosecutor commented that Defendant changed his testimony as to how many shots he fired from his revolver. This comment is based on testimony during cross-examination where the prosecutor asked Defendant if his "gun turned into at least a seven-shooter and quite probably a nine-shooter." Defendant responded, "Could have been." The prosecutor commented during closing that Defendant "and his attorney had to come up here and provide the attorney a way to argue. . . ." After

Defendant's objection, the State clarified that "his attorney now has to argue that Ignacita murdered her daughter and grandchild ... and then she ... reloaded two cartridges" into the revolver. The State relied on Defendant's testimony that he had not reloaded the weapon and had no explanation for how more than six rounds were fired from the gun. In closing, the State commented that "whoever was firing that .357 at some point had to reload it." We find the State "merely argued that the facts in evidence did not support Defendant's story." *Id.* The evidence does not show that the State expressed a personal opinion about Defendant's evidence. *See State v. Lamure,* 115 N.M. 61, 67, 846 P.2d 1070, 1076 (Ct.App.1992), *cert. denied,* 114 N.M. 720, 845 P.2d 814 (1993).

Defendant further argues that the statement that he forced Cheryl to beg for her life exceeded the bounds of proper argument. The prosecutor specifically stated that Cheryl either "falls to her knees begging for her and her babies' lives—or [Defendant] orders her to her knees." This statement, although approaching the point of appealing to the jury's passions, is not inconsistent with the evidence. *Aguilar,* 117 N.M. at 507, 873 P.2d at 253. Trial courts have wide discretion in controlling counsel's closing arguments and unless prejudice or abuse of discretion is evident, we find no error. *State v. Jett,* 111 N.M. at 314, 805 P.2d 78, 83 (1991). We do not find this conduct reaches the point of requiring reversal. We have reviewed Defendant's remaining arguments and find no merit in them.

### VI

In conclusion, where sufficient evidence is presented to support a finding that a defendant acted in self-defense, a defendant is entitled to have the jury receive an instruction on voluntary manslaughter based on imperfect self-defense. An involuntary manslaughter instruction, however, is inappropriate where one intentionally, rather than unintentionally, harms another while in the act of self-defense. The use of excessive force in self-defense makes the act of killing unjustified, and it therefore cannot be considered a lawful act done in an unlawful manner under the involuntary manslaughter statute, Section 30–2–3(B). Accordingly, we find that Defendant was not entitled to involuntary manslaughter instructions in the deaths of Deputy Martinez, Officer Huber, or Ignacita.

As for Defendant's claim regarding proper jury instruction for Macario's death, we find no evidence to support Defendant's contention that Macario was killed as a bystander while Defendant was acting in self-defense against Eloy. Accordingly, the trial court properly refused to instruct the jury on voluntary manslaughter. In addition, we find the evidence insufficient to support instructions on defense of habitation in the deaths of Cheryl and Mary Ellen where Defendant used deadly force although he was in no personal danger from the victims.

We also find substantial evidence was presented to sustain the verdict of first-degree murder in the death of Mary Ellen. Finally, we find that the prosecutor's conduct did not rise to the level of reversible error. Therefore, we affirm.

**IT IS SO ORDERED.**

RANSOM and FROST, JJ., concur.